# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Marion Bowman, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2012-213468

---

## ON WRIT OF CERTIORARI

---

Appeal from Dorchester County
James E. Lockemy, Post-Conviction Relief Judge

---

Opinion No. 27761
Heard April 13, 2017 – Filed January 10, 2018

---

## AFFIRMED

---

Chief Appellate Defender Robert M. Dudek and
Appellate Defender David Alexander, both of Columbia,
for Petitioner.

Attorney General Alan M. Wilson, Chief Deputy
Attorney General J. Robert Bolchoz, Deputy Attorney
General Donald J. Zelenka, and Assistant Attorney
General Alphonso Simon, Jr., all of Columbia, for
Respondent.

---

**JUSTICE KITTREDGE:** Petitioner Marion Bowman sought post-conviction relief (PCR) from his sentence of death for the murder of Kandee Martin in February of 2001. The essence of Petitioner's claim is that trial counsel was deficient in failing to object to the State's cross-examination of prison-adaptability expert James Aiken. The PCR court denied Petitioner's application. We issued a writ of certiorari to review the order of the PCR court. We conclude there is evidence to support the PCR court's findings, and we affirm.

## I.

Around 7:55 p.m. the evening of February 16, 2001, a motorist was traveling down Nursery Road in the rural, northwestern portion of Dorchester County near the Orangeburg County line, when he spotted a small, four-door sedan parked unusually along the shoulder of the road. As the motorist slowed down and pulled alongside the car to take a look, he noticed that some of the windows were down and the lights were off, but no one was in sight. Although this struck him as an odd way to leave a vehicle unattended, he did not investigate further.

Several minutes later, a neighbor who lived on Nursery Road was watching television in his living room when he heard a loud noise outside. He muted the television, and within fifteen seconds, he heard three gunshots. Suspecting someone was night-hunting, the neighbor got in his car and drove in the direction of the noise to investigate; however, after driving along Nursery Road, he was unable to find anything unusual. He returned home, continued watching television, and went to sleep around midnight. Shortly after 3:30 a.m., he was awakened by what initially sounded like more gunshots. He again got in the car to investigate down Nursery Road, this time spotting a small, four-door sedan positioned on a tractor path between the tree line and a field approximately seventy-five feet from the paved road. The vehicle was engulfed in flames extending almost five feet around and more than fifteen feet above; no other vehicles or persons were anywhere in sight. The neighbor immediately returned home and reported the vehicle fire.[1]

---

[1] At trial, the State's arson investigation expert explained the loud noise that awakened the neighbor was mostly likely the explosion of either a tire or a helium-filled component of the vehicle's suspension system.

The local fire department responded to the scene.  After putting out most of the fire, firefighters were able to open the trunk of the smoldering car, where they discovered the scorched remains of a human body.  The vehicle's charred license plate was recovered, and police discovered the car was registered to twenty-one-year-old Kandee Martin (the Victim) and her mother.[2]

Arson investigators concluded the fire was intentionally set.  The autopsy revealed the Victim was not burned alive, but rather suffered two fatal gunshot wounds—one to the head and one to the torso—before her body was placed in the trunk of her car and set on fire.  No projectiles were recovered from the Victim's body; however, police found six spent .380 shell casings in the middle of Nursery Road next to a pool of blood, which contained some hair and the back of an earring.  A trail of bloodstained grass and ruffled pine straw led investigators approximately thirty feet into the woods where they discovered a woman's black dress shoe next to bloodstained pine straw and branches.  Through DNA testing, police identified the blood on the road, pine straw, and branches as belonging to the Victim, and the Victim's mother identified the black dress shoe found in the woods as her daughter's.

Later that morning, Petitioner Marion Bowman was arrested on an outstanding warrant after police learned he was with the Victim the night before.  He was subsequently indicted for murder and third-degree arson, and shortly thereafter, the State served upon defense counsel a notice of intent to seek the death penalty.  The case was tried in May 2002, and the following summarizes the State's evidence at trial.

Less than two weeks before the murder, Petitioner, accompanied by his first cousin Taiwan Gadson and his childhood friend Travis Felder, purchased a High Point .380 automatic pistol from "[a] dude in Orangeburg."  On the afternoon of the murder, Petitioner and several others gathered at a friend's house to socialize and drink alcohol.  Petitioner carried his .380 pistol to the party in a brown paper bag, then stashed it in a 55-gallon drum/fire barrel upon arrival.  Shortly thereafter, Petitioner left the party to pick up some groceries.  At some point while he was gone, Petitioner's first-cousin Hiram Johnson relocated the stashed gun, ostensibly

---

[2] An x-ray was taken during the autopsy in an attempt to identify the body through dental records; however, investigators were not able to identify the body except through a DNA comparison with the Victim's family members.

for safety purposes.  According to six different witnesses, Petitioner became confrontational when he returned and learned his gun had been moved, but Johnson quickly intervened, explained that he moved the gun, and returned the gun to Petitioner.  After looking over the gun to ensure it was still in working order, Petitioner tucked the gun in his back pocket.

 Sometime later, Petitioner left the party again to run errands with his sister Yolanda Bowman (Yolanda) and their cousin, Katrina West.  As they drove through downtown Branchville, they spotted the Victim sitting in her car talking with a man standing outside the Victim's driver's window.  Evidently, the Victim owed Petitioner some money.  Petitioner, who was sitting in the back seat, asked Yolanda to pull the car over so he could speak to the Victim.  Yolanda complied, and Petitioner rolled down his window and tried to get the Victim's attention.  The Victim was mid-conversation with the man standing outside her car, and she asked Petitioner to wait a minute.  Petitioner then cursed at the Victim and, in front of three witnesses, said he was going to kill the Victim that evening.[3]

Around 7:30 p.m. that evening, Petitioner returned to the party with the Victim; the Victim drove herself and Petitioner in her Ford Escort, a small, four-door sedan. Gadson got in the car with Petitioner and the Victim, they stole some gas from a convenience store, and Petitioner directed the Victim to drive out to Nursery Road. Once they reached Nursery Road, Petitioner instructed the Victim to pull over and turn off the vehicle lights.  The Victim remained in the car while, Petitioner and Gadson exited the vehicle and began walking down Nursery Road; as they walked, Petitioner told Gadson he intended to kill the Victim because he believed she was wearing a wire.  A few minutes later, the Victim got out of the car and caught up with them, she grabbed Petitioner by the elbow and said she was scared because it was extremely dark outside.  Just as the Victim was pleading to leave, the threesome saw a car coming down the road, so they all ran and hid in the woods until the car passed.

---

[3] All three witnesses consistently relayed the general sentiment of Petitioner's statement; however, there were minor discrepancies regarding the precise wording: "Fuck waiting a minute, I'm about to kill this bitch"; "Fuck it, that bitch be dead by dark"; "Fuck that ride. That bitch will be dead by dark fall."  At the time of Petitioner's statement, the sun had not yet set.

The Victim then started walking back down the road with Petitioner following. As Gadson came out of the woods behind them, he saw Petitioner fire three times at the Victim. The Victim ran towards Gadson, but turned to face Petitioner and begged, "Please, [Petitioner], don't shoot me no more. I have a baby to take care of." Petitioner then fired twice more and the Victim fell to the ground. Gadson testified he jumped in the car while Petitioner dragged the Victim's body by her feet into the woods. Petitioner later returned, got into the driver's seat of the Victim's car, and stated "I shot that bitch in the head. Heard her head hit the ground." The two then returned to Branchville in the Victim's car, and on the way back, Petitioner threatened Gadson that if he ever told anyone what happened, he would blow Gadson's brains out.

Sometime after midnight, Petitioner drove himself, Gadson, Johnson, and Darrien Williams to a nightclub in the Victim's car. Petitioner stated the car was stolen and instructed everyone to wear gloves to avoid leaving fingerprints. At the club, Petitioner attempted to sell the Victim's car with no success. Thereafter, Petitioner drove the group back to Branchville in the Victim's car; as he drove, he had the murder weapon sitting in his lap and remarked, "I killed Kandee, heh heh heh."

Shortly after 3:00 a.m., Petitioner knocked on Felder's door and asked Felder to give him a ride. Felder testified that he got in his own car and followed Petitioner, who was driving the Victim's car, back to Nursery Road. Petitioner pulled over on the side of the road and went into the woods for a minute. Then, Felder saw Petitioner dragging a body out of the woods by the feet. As Petitioner opened the trunk and put the body inside, Felder recognized the Victim's face by the trunk light. Petitioner looked back at Felder and said "You didn't think I would do it, did you? I killed Kandee Martin." Petitioner instructed Felder to reposition his car while Petitioner drove the Victim's car into a field. Felder watched as Petitioner lit a fire and tossed it in the car, which immediately became engulfed in flames. Felder then drove Petitioner back to Branchville and returned to his girlfriend's house.

When Petitioner was arrested the following day, the Victim's wristwatch was found in the pocket of the pants Petitioner wore the previous night. A few days later, Petitioner's wife found the murder weapon stuffed in a couch in the couple's living room; upon this discovery, she enlisted the help of Petitioner's sisters and father, who dropped the gun off a bridge into the Edisto River. Petitioner's DNA was

identified in the vaginal swabs taken from the Victim during autopsy.[4]  The gun was recovered by a team of divers and the shell casings recovered at the scene matched the pistol.  Additionally, the arson investigator testified that a heavy petroleum product—not gasoline—was found on Petitioner's pants, but the items retrieved from the burning car had gasoline on them.

## II.

Petitioner proceeded to trial.  Although the fact that the Victim had been murdered was indisputable, the defense theory in the guilt phase was that it was not Petitioner but some other person who killed her and burned her body.  Ultimately, a jury found Petitioner guilty of murder and arson.

During the sentencing phase of the trial, the State incorporated all of the evidence introduced in the guilt phase and presented evidence of Petitioner's 1998 third-degree burglary and petty larceny convictions.  The State introduced additional photographs of the Victim's charred corpse in the trunk of her car and presented further testimony from the forensic pathologist who performed the autopsy as to the gruesome condition of the Victim's body.  The State also introduced pictures of the Victim celebrating family occasions and elicited victim-impact testimony from the Victim's mother and father before resting its case.  The State did not present any evidence during the sentencing phase regarding Petitioner's potential to adapt to prison or conditions of prison.

Petitioner followed by presenting extensive mitigation evidence, including testimony of Petitioner's mother and older sister concerning Petitioner's troubled childhood and abusive upbringing.  The defense also presented testimony of Alice Baughman, an adult education teacher at the Dorchester County Detention Center where Petitioner was held awaiting trial.  Baughman testified Petitioner had become one of her teaching assistants and had never exhibited any inappropriate behavior during classes.  The defense also presented testimony of two detention center guards, one of whom described Petitioner as "just as polite as can be."  The

---

[4] It is unclear when or under what circumstances Petitioner and the Victim had sexual contact.  Although no reference was made in front of the jury, the record suggests that Petitioner may have had sex with the Victim's corpse after he shot and dragged her into the woods.  There is also some indication that Petitioner provided the Victim with crack in exchange for sex and/or oral sex at a mutual friend's house on the afternoon of the murder.

other, however, testified that Petitioner occasionally refused to cooperate "depend[ing] on what kind of day [Petitioner] was having," but that Petitioner had never become violent or caused her to feel threatened.

Additionally, the defense presented the testimony of forensic social work expert Jeffrey Youngman, who testified in detail to Petitioner's upbringing. As part of Youngman's testimony, he educated the jury on many aspects of Petitioner's life, including being born to a teenage mother, domestic violence between his parents that eventually led to their divorce, and prolonged and extreme financial hardship. Moreover, the mitigation evidence included Petitioner's low IQ and difficulties in school, his family history of alcohol and drug abuse (including his mother's conviction for drug distribution), his mother's debilitating health issues that required Petitioner to provide care for her at the age of nine, and Petitioner's experience selling drugs beginning at age 14. Youngman observed that these myriad factors combined to undermine Petitioner's ability to develop good judgment skills. On cross-examination, Youngman explained that people who sell drugs engage in certain behavior patterns to protect their image and opined "I think part of this whole process was him protecting his image" as a drug dealer.

Petitioner thereafter presented the testimony of James Aiken, a correctional consultant who testified about the classification of prisoners and Petitioner's adaptability to prison. It is counsel's failure to object when Aiken's testimony transitioned from a discussion of prison adaptability into one about general prison conditions that lies at the heart of this PCR case.

Aiken opined that Petitioner had adjusted well to prison in the past, and relayed the security measures at correctional facilities—including gun towers, fences, bars, concrete structures, constant supervision, and no possibility of parole. Aiken did not believe Petitioner would pose a risk of future dangerousness. On cross-examination, the Solicitor elicited testimony from Aiken about the various levels of security that exist within a prison environment (i.e. minimum, medium, maximum, and "super max") and that inmates may be assigned to less restrictive environments within prison as an incentive for their good behavior. Aiken acknowledged that while in prison, Petitioner would have the ability to move within the facility, including to perform work duties and access secure outdoor recreation areas; however, Aiken explained that, due to the seriousness of the offense of which Petitioner had been convicted, he would never be eligible for work release and would never be permitted to leave the prison facility.

In response to the Solicitor's question regarding what incentive Petitioner would have to follow the rules, Aiken explained,

> The incentive that he has is . . . that the management of that prison system has authority to ensure that his behavior is appropriate. And that's anywhere from sanctioning him . . . [to] using lethal force against that individual . . . We are not in the business of motivation when you deal with a life without parole [sentence]. Our business is incapacitation. We're not preparing you to go anywhere. You're going to stay with us as long as you are breathing, so we're not talking about trying to prepare you for anything. What we're talking about is that we do a good job of keeping you behind bars and behind fences and in gun towers for the remainder of your life.

On redirect examination by defense counsel, Aiken gave a more detailed description of super max confinement and testified that Petitioner would not be going to a "kiddy camp" or a place where he would be "mollycoddled" or have "picnic lunches outside the gate." Aiken explained that all inmates are expected to work to perform cheap labor to reduce the burden on taxpayers and repay society and reiterated, "I don't care how well he does, he will never get out of that prison." Nevertheless, Aiken explained that Petitioner could salvage the rest of his young life and have some redeeming qualities.

On re-cross, the Solicitor attempted to elicit information about how often inmates generally escape from prison, but defense counsel's objection to this irrelevant evidence was sustained. Following a curative charge by the judge as to the escape question, the Solicitor elicited from Aiken testimony about general prison conditions, asking "what is he adapting to, what is going on there?" Aiken described the daily routine an inmate would likely have including going to work, eating meals, and sleeping, cautioning "you have to understand that this is in a prison environment and this is not in a community environment . . . . It's just like the police being in your home and writing you up for any violation." Aiken explained that inmates are under 24-hour supervision and inmates are cited for administrative violations such as speaking too loudly, being disrespectful, or disobeying a direct order. Then the Solicitor asked:

> Q. And are there recreational facilities available?

> A. Yes, sir.

Q. What type of recreational facilities?

A. An inmate can play basketball, an inmate can exercise, you know, on his own, but to understand, again, to give it in a complete context as briefly as I can, you're doing it around very dangerous predator people.

Q. My question is related to the recreational facilities and we understand prison is dangerous people. In addition to that are there libraries they go to, to read books?

A. Yes, sir. As guaranteed by the constitution.

Q. Are there movies they can watch?

A. Yes, sir.

Q. Television?

A. In some instances, yes, sir.

Q. Softball, do they play softball?

A. I don't know. It's some type of recreation such as that.

Q. Thank you. That's all I have.

It is counsel's failure to object to this particular prison-conditions exchange upon which Petitioner's ineffective assistance of counsel claim is based.

Ultimately, the jury found the evidence supported two aggravating factors—the murder was committed during the commission of a kidnapping and the murder was committed during the commission of a larceny with the use of a deadly weapon— and recommended death. The trial judge sentenced Petitioner to death for murder and ten years for arson.

On direct appeal, Petitioner challenged the admission of Aiken's testimony regarding general prison conditions. *State v. Bowman*, 366 S.C. 485, 623 S.E.2d

378 (2005). This Court found that because defense counsel failed to contemporaneously object to the solicitor's prison-conditions line of questioning, the issue of its propriety was not preserved for appellate review, and we affirmed Petitioner's convictions and sentences. In so holding, however, we reminded the bench and the bar that evidence of general prison conditions is irrelevant to the jury's determination of whether a defendant should be sentenced to death or life imprisonment and thus should not be permitted. *Id*. at 498–99, 623 S.E.2d at 387.

This application for post-conviction relief (PCR) presents the claim that trial counsel was deficient in not objecting to the State's re-cross examination of Aiken concerning general prison conditions. The PCR judge denied relief. This appeal followed.

### III.

Petitioner argues defense counsel was deficient in failing to object to the Solicitor's questioning of defense prison expert Aiken regarding general prison conditions and that, pursuant to this Court's decision in *State v. Burkhart*, 371 S.C. 482, 640 S.E.2d 450 (2007), he is relieved of his burden of showing he was prejudiced by this deficiency. We address these arguments in turn.

"The United States Supreme Court has set forth a two-pronged test to establish ineffective assistance of counsel by which a PCR applicant must show (1) counsel's performance was deficient, *and* (2) the deficient performance prejudiced the defense." *McHam v. State*, 404 S.C. 465 473–74, 746 S.E.2d 41, 46 (2013) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *Holden v. State,* 393 S.C. 565, 713 S.E.2d 611 (2011)).

"On certiorari in PCR cases, the Court applies an any evidence standard of review." *McHam*, 404 S.C. at 472–73, 746 S.E.2d at 45 (citing *Terry v. State,* 394 S.C. 62, 66, 714 S.E.2d 326, 328 (2011)). "'This Court will uphold the findings of the PCR judge when there is any evidence of probative value to support them,' and it 'will reverse the PCR judge's decision when it is controlled by an error of law.'" *Id*. at 473, 746 S.E.2d at 45 (quoting *Suber v. State,* 371 S.C. 554, 558–59, 640 S.E.2d 884, 886 (2007)).

At the intersection of Petitioner's claims, we find three factors present. First, we acknowledge the wide path extended to a capital defendant to introduce mitigation evidence pursuant to the Eighth Amendment to the United States Constitution.

Second, we must recognize our state law that draws a sharp admissibility dividing line between prison adaptability evidence and general prison condition evidence. Third, we must consider the practical, strategy decisions made by trial counsel. The confluence of these factors does not lead to a straightforward, formulaic response, and as we address these factors, we are mindful of the deferential standard of review that applies to factual determinations in PCR matters.

## A.

Cognizant of the practicalities of an actual death penalty trial, we observe that here, trial counsel was forced to confront two realities: the gruesome nature of the murder and the overwhelming evidence of Petitioner's guilt. At the PCR hearing, counsel testified at length to the mitigation strategy. Part of the mitigation approach was, of course, a thorough examination of Petitioner's troubled upbringing and abusive family environment. Counsel also made the strategic decision to introduce evidence that Petitioner would adapt well to prison, hence the decision to call Aiken as a witness. Counsel made this decision after much thought and reflection.

Counsel explained that he put James Aiken on the stand to show that there were sufficient security measures in prison such that Petitioner would never pose a threat to society again if Petitioner did not receive the death penalty. Counsel stated that the strategy was to show the jury that "this is going to be so horrible the rest of his life that this is going to be sufficient punishment and you don't have to give him death." Counsel further explained:

> [Y]ou have your academic believers on the subject but I guess I was kind of focusing on the fact that since you knew you were going to be getting that life without parole charge,[5] you considered in sentencing your best shot was to convince this jury that life in prison was going

---

[5] Just a few months before Petitioner's trial, the United States Supreme Court decided *Kelly v. South Carolina*, 534 U.S. 246 (2002), finding that where future dangerousness is at issue and the jury's only two sentencing alternatives are death or life imprisonment, due process requires that the jury be informed of the defendant's parole ineligibility. This Supreme Court decision, and the Legislature's subsequent codification of the requirement that life without parole be charged in all death penalty cases, ended the years-long debate over whether capital defendants were entitled to such a jury charge.

to be just as bad if not worse for [Petitioner] than giving him the death penalty[.] Yes, it is. I'm not trying to be cruel to [Petitioner]. Yes, I don't know how long his natural life is going to be but everyday you're in a six by eight cell, you can't go get an ice cream cone when you want one and you darn sure are not going to enjoy any of the benefits of this earth. You are in a cell, you are behind wire and you're living with whatever is next door, whatever he's in for next door, and I just had a case with a guy, sliced and diced and killed another man in prison, 22 year old kid. It is a predatory place. So, yes, paint a picture, paint it nasty for them.

When cross-examined about his strategy underlying his decision to put up the adaptability expert, defense counsel explained:

[H]ow else do you argue about somebody having a chance to live in prison? I mean, I don't argue academically. . . . I want everybody to read this record one day and say what are you going to do for the guys who are in the pits, who are doing this in action, with the guns blazing, you're in there trying to save a young kid's life and all you have to work with is trying to convince twelve people he can adapt to prison . . . .

Counsel admitted he

made the calculated decision that it was better to go down the road of saying life in prison is so horrible that it is good enough punishment for [Petitioner] knowing full well there was a risk that [the Solicitor] might come back a little bit and say, "Well, you know, prison ain't as bad as all that." . . . [T]his case was kind of on that new frontier, we had just recently had the life without parole charges were mandatory in every death penalty case, so we're kind of on the frontier in dealing with that and how it could be litigated and used by both the State and the defense in the sentencing phase of the capital trial.

Counsel explained that, given the testimony he elicited on the issue, he did not see a valid objection to the solicitor's own limited questioning on prison conditions—except when the solicitor went outside the scope into questioning about escape, to which counsel successfully objected. Indeed, it was not until several years after Petitioner's trial that this Court decided *Burkhart*, upon which Petitioner's PCR

claim is primarily based.

The PCR court found that counsel's strategy was reasonable under the circumstances. The PCR court noted counsel is not required to be clairvoyant or foresee changes in the law subsequent to Petitioner's trial and that counsel testified he took the calculated risk that he would gain more with his stark portrayal of a life-without-parole sentence than with no prison-related evidence. *See Teamer v. State*, 416 S.C. 171, 183, 786 S.E.2d 109, 115 (2016) (observing "We have never required an attorney to be clairvoyant or anticipate changes in the law").

Petitioner argues that counsel was deficient for failing to object to Aiken's testimony since this Court made clear long ago that such evidence was irrelevant. Petitioner further contends this evidence was "highly prejudicial in the eyes of the jury" and that counsel's failure to object to it "barred consideration of this winning issue on petitioner's direct appeal."

Before we review the PCR court's findings under the two-pronged *Strickland* analysis, we must first address the constitutional framework surrounding the admissibility of mitigating evidence in the sentencing phase of a capital case.

**B.**

"Where the State imposes the death penalty for a particular crime, . . . the Eighth Amendment imposes special limitations on that process." *Payne v. Tennessee*, 501 U.S. 808, 824 (1991). In relevant part, a state "'cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty.'" *Id*. (quoting *McCleskey v. Kemp*, 481 U.S. 279, 305–06 (1987)). "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (internal citation omitted). "'The sentencer cannot be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *McCleskey*, 481 U.S. at 304 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). In short, the Eighth Amendment demands that a capital defendant be given wide latitude to present any relevant evidence of potentially mitigating value that might convince the jury to impose a sentence of life in prison instead of death.

We begin by acknowledging the unique distinction South Carolina jurisprudence has drawn between evidence of prison adaptability, which we have held is relevant and admissible, and evidence of general prison conditions, which we have held is not. The rationale we have offered for excluding evidence of general prison conditions is that it does not "bear on a defendant's character, prior record, or the circumstances of his offense." *State v. Koon*, 278 S.C. 528, 537, 298 S.E.2d 769, 774 (1982) (affirming the exclusion of evidence of future adaptability to prison life as irrelevant to the jury's sentencing determination), *abrogated by Skipper v. South Carolina*, 476 U.S. 1 (1986) (holding evidence of adjustability to life in prison is constitutionally relevant), *as recognized by Chaffee v. State*, 294 S.C. 88, 91, 362 S.E.2d 875, 877 (1987).

Although we have acknowledged it "'is essential that the jury have before it all possible relevant information about the individual whose fate it must determine,'" *State v. Plath*, 281 S.C. 1, 15, 313 S.E.2d 619, 627 (1984) (quoting *Barefoot v. Estelle*, 463 U.S. 880 (1983)), we have nevertheless eschewed evidence regarding the "controlled environment of life imprisonment." *Id.* (citing *Koon*, 278 S.C. at 536, 298 S.E.2d at 773). We justified this distinction by reasoning:

> A jury needs to know how a given defendant came to commit a given aggravated murder, to include aspects of his background, his character and the setting of the crime itself which may explain or even mitigate the conduct of which he has been found guilty. A jury does not need to know how often he will take a shower or whether or not he will be lonely and withdrawn during his tenure at [prison].

*Id.* at 15, 313 S.E.2d at 627. Although the United States Supreme Court has characterized this distinction as "elusive" and stated "its precise meaning and practical significance" are "difficult to assess," we have nevertheless clung to this division. *Skipper*, 471 U.S. at 7.

Even as recently as 2007, we have stated that "'determinations as [to] the time, place, manner, and conditions or execution or incarceration are reserved to agencies other than the jury.'" *State v. Burkhart*, 371 S.C. 482, 487–88, 640 S.E.2d 450, 453 (2007) (quoting *Plath*, 281 S.C. at 15, 313 S.E.2d at 627) (emphasis omitted). In doing so, we observed this Court has "long held that evidence in the sentencing phase of a capital trial must be relevant *to the character of the defendant or the circumstances of the crime*." *Id.* at 487, 640 S.E.2d at 453

(emphasis added).  The point we have repeatedly emphasized—namely, that only the character of the defendant and circumstances of the crime are relevant in the sentencing phase of a capital trial—evolved from cases decided in the wake of the United States Supreme Court's landmark decision in *Furman v. Georgia*, 408 U.S. 238 (1972) (two Justices opining that capital punishment was unconstitutional *per se*; four Justices opining that it was not; and three Justices declining to reach the issue, concluding instead that Georgia's statutory scheme was unconstitutional as applied).  The constitutional concerns expressed in *Furman* were that the system of imposing the death penalty must be "structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion."  *California v. Brown*, 479 U.S. 538, 541 (1987) (citing *Furman*, 408 U.S. at 238).

In response to *Furman*, most state legislatures—including Georgia's and South Carolina's—redesigned existing capital sentencing statutory schemes to address the concerns the Supreme Court expressed in *Furman*.[6]  *See* 1974 Act No. 1109 §§ 1–3 (codified at S.C. Code Ann § 16-3-20); *see also* 1977 Act. No. 177 (codified at S.C. Code Ann. §§16-3-20, -25 to-28 (2015)) (setting forth, among other things, lists of aggravating and mitigating circumstances to guide the jury's individualized sentencing inquiry; the requirement that at least one statutory aggravating circumstance be found beyond a reasonable doubt as a prerequisite to the imposition of the death penalty; and mandatory review by this Court to ensure proportionality of the death sentence to the facts of the crime and that the death sentence was not the result of "passion, prejudice, or any other arbitrary factor").

Four years later, the Supreme Court examined Georgia's post-*Furman* statutory revisions, and a majority of the Supreme Court concluded that, in the context of Georgia's new procedural safeguards, "the punishment of death does not invariably violate the Constitution" and that the procedural mechanisms included in Georgia's revised statutory scheme satisfied the Eighth Amendment.  *Gregg v. Georgia*, 428 U.S. 153, 169 (1976).

In so holding, the Supreme Court observed that "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," and specifically noted that in "the determination of sentences, justice usually requires that there be taken into account the *circumstances of the*

---

[6] *Gregg v. Georgia*, 428 U.S. 153, 179 n.23 (1976) (listing the thirty-five states in which legislative bodies took action to amend capital sentencing schemes in response to *Furman*).

*offense* together with the *propensities of the offender*." *Gregg*, 428 U.S. at 189–90 (emphasis added) (internal quotation marks and citation omitted); *accord Woodson*, 428 U.S. at 304 (holding "the Eighth Amendment requires consideration of the *character and record of the individual offender* and the *circumstances of the particular offense* as a constitutionally indispensable part of the process of inflicting the penalty of death" (emphasis added) (internal citation omitted)).

In reconciling the constitutional requirement for individualized sentencing determinations in capital cases with the countervailing requirement that juries not be given unfettered sentencing discretion to avoid "wholly arbitrary and capricious action," the Court emphasized the difference between "arbitrary grants of mercy," which are perfectly constitutional, and arbitrary impositions of the death penalty, which are not. *Gregg*, 428 U.S. at 189, 199–200. Further, the Court flatly rejected a challenge to the "wide scope of evidence and argument allowed" during the sentencing phase and found "[s]o long as the evidence introduced and the arguments made at the [sentencing] hearing do not prejudice a defendant, it is preferable not to impose restrictions. *We think it is desirable for the jury to have as much information before it as possible when it makes the sentencing decision*." *Gregg*, 428 U.S. at 203–04 (emphasis added).

Thus, the character of the defendant and the circumstances of the crime are certainly a part of the individualized sentencing hearing the Eighth Amendment demands. However, there is nothing in the constitution or federal jurisprudence that forbids the consideration of *anything* which might serve as a mitigating circumstance. *Skipper*, 476 U.S. at 4 ("[T]he sentencer may not refuse to consider or be precluded from considering *any* relevant mitigating evidence" (emphasis added)); *Caldwell v. Mississippi*, 472 U.S. 320, 330–31 (1985) (observing a capital defendant has a constitutional right to the consideration of "'those compassionate or mitigating factors stemming from the diverse frailties of humankind,'" including a plea for mercy (quoting *Woodson*, 428 U.S. at 304)).

Rather, the determination of what evidence is admissible during a capital sentencing hearing is left to the states, subject of course to the limitations of the constitution, including the Eighth Amendment. *See, e.g.*, *Simmons v. South Carolina*, 512 U.S. 154, 168 (1994) (acknowledging that the federal courts will generally "defer to a State's determination as to what a jury should and should not be told about sentencing"). Viewing as a whole both federal and state jurisprudence on this issue, we believe retaining this state-law distinction serves the purpose of preventing both the State and the defense from engaging in

immaterial forays into the microscopic details of a defendant's prison experience. However, in acknowledging this distinction as the general rule applicable in the vast majority of cases, we also acknowledge that in certain cases the Eighth Amendment may not forbid but rather *require* that a defendant be permitted to present certain relevant evidence in this regard. *See State v. Torres*, 390 S.C. 618, 624–26, 703 S.E.2d 226, 229–30 (2010) (finding video recording of capital defendant in prison did not introduce an arbitrary factor into sentencing); *Burkhart,* 371 S.C. at 488, 640 S.E.2d at 453 (acknowledging that at times there may be some overlap between evidence of a defendant's adaptability to prison and prison conditions generally and cautioning that prison conditions evidence should be "narrowly tailored"). Thus, in reaffirming the rule forbidding evidence of general prison conditions, we simply note that it is not without exception.

With this background in mind, we turn now to an examination of the particular prison conditions evidence at issue here.

## C.

"It is firmly established that otherwise inadmissible evidence may be properly admitted when opposing counsel opens the door to that evidence." *State v. Page*, 378 S.C. 476, 482–83, 663 S.E.2d 357, 360 (Ct. App. 2008) (citations omitted). Indeed, "[c]onduct that would otherwise be improper may be excused under the 'invited reply' doctrine if the prosecutor's conduct was an appropriate response to statements or arguments made by the defense." *Vaughn v. State*, 362 S.C. 163, 169, 607 S.E.2d 72, 75 (2004). "[T]he idea of an invited response is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Id.* "Once the defendant opens the door, the solicitor's invited response is appropriate so long as it is does not unfairly prejudice the defendant." *Ellenburg v. State*, 367 S.C. 66, 69, 625 S.E.2d 224, 226 (2006) (citation omitted). Unless the State's response is inappropriate or unfairly prejudicial, counsel is not deficient for failing to object. *Id.*

As noted, at the PCR hearing, counsel testified his decision to elicit testimony that Petitioner was not going to a "kiddy camp" and that he would not be "mollycoddled" was a strategic choice, and counsel acknowledged that he expected the solicitor to respond with questions about some of the less harsh conditions of confinement.

In examining the issue, the PCR court noted that most of the cases admonishing

against prison conditions evidence were decided after Petitioner's trial, and although *Plath* had been decided prior to Petitioner's trial, this Court held in *Plath* that the defense had opened the door to the otherwise inadmissible evidence and therefore its admission was not reversible error.

> In the case before us, defendants elected to enter the forbidden field of social policy and penology. It is neither surprising nor can it be deemed prejudicial that the State responded in kind, attempting to show through defendants' own witnesses that life imprisonment was not the total abyss which they portrayed it to be. . . . The State was entitled to make this response.

*Plath*, 281 S.C. at 15–16, 313 S.E.2d at 627–28. The PCR court also noted the United States Supreme Court's decision in *Kelly v. South Carolina*, 534 U.S. 246 (2002), which was decided just months before Petitioner's trial and which held that due process requires the jury to be informed that a life sentence meant life without the possibility of parole. This recent legal development influenced counsel's calculated choice to use the unambiguous "without parole" aspect of that sentence as part of the mitigation strategy.

Counsel's testimony at the PCR hearing is revealing. He acknowledged the risk of opening the door to otherwise inadmissible prison condition evidence. Counsel, however, believed the potential benefit outweighed the risk. It follows that counsel exercised judgment, as he testified, "in the pits, . . . doing this in action, . . . trying to save a young kid's life." Simply stated, counsel weighed the benefits to Petitioner as well as the potential prejudice in deciding whether to present the testimony of Aiken.

The PCR court carefully evaluated the law and all the circumstances, concluding that, given the state of the law at the time of Petitioner's trial, counsel was not deficient in his strategic choice to elicit limited testimony on prison conditions as part of his strategy to portray life imprisonment as a particularly harsh sentence and viable sentencing alternative. The PCR court further found that counsel was not deficient in acquiescing to the solicitor's limited responsive questioning on the same subject, noting counsel's testimony that he believed the defense would gain more through a stark portrayal of a life-without-parole sentence than it lost through any response.

Given all this, is there evidence to support the PCR court's determination that

counsel was not deficient?  By myopically considering our state's nuanced and unique distinction between prison adaptability and general prison condition evidence, it might appear a finding of deficient representation is warranted.[7]  While we acknowledge that a close question is presented, in light of the state of the law at the time of Petitioner's trial and the narrowly tailored scope of the prison conditions evidence elicited, we find there is evidence in the record to support the PCR court's finding.  There is evidence that counsel articulated a valid reason for employing this strategy, and because the State's response was proportional and confined to the topics to which counsel had opened the door, we affirm the finding that counsel was not deficient in failing to object to the State's line of questioning. *Ellenburg*, 367 S.C. at 69, 625 S.E.2d at 226 (finding counsel is not deficient for failing to object to evidence where counsel opened the door); *Caprood v. State*, 338 S.C. 103, 110, 525 S.E.2d 514, 517 (2000) ("Where counsel articulates a valid reason for employing certain strategy, such conduct will not be deemed ineffective assistance of counsel.") (citing *Stokes v. State,* 308 S.C. 546, 419 S.E.2d 778 (1992)); *Whitehead v. State*, 308 S.C. 119, 122, 417 S.E.2d 529, 531 (1992) ("Courts must be wary of second-guessing counsel's trial tactics; and where counsel articulates a valid reason for employing certain strategy, such conduct will not be deemed ineffective assistance of counsel.") (citing *Goodson v. United States,* 564 F.2d 1071 (4th Cir. 1977)).

## D.

Ordinarily, having found counsel was not deficient, we would not reach the prejudice prong.  This case, however, presents a degree of overlap on the deficient representation and resulting prejudice prongs, for counsel carefully evaluated the potential for prejudice in pursuing his strategy.  Indeed, woven into the PCR court's finding of no deficient representation is counsel's calculus of the potential benefits and risks associated with his strategic decision.  We, therefore, turn now to the issue of prejudice to take the opportunity to correct Petitioner's misreading of our *Burkhart* decision.

Shortly after this Court affirmed Petitioner's conviction and sentence on direct appeal, we decided *State v. Burkhart*, 371 S.C. 482, 640 S.E.2d 450 (2007), in which a majority of this Court reversed a death sentence, finding that evidence of

---

[7] We reiterate that the prison adaptability versus general prison condition distinction is a creation of state law and is not mandated by the Eighth Amendment or other constitutional provision.

prison life in general introduced an arbitrary factor into the jury's consideration in violation of section 16-3-25(C) of the South Carolina Code. In a concurring opinion, Justice Pleicones went beyond the majority and opined that such statutory violations were not subject to harmless error analysis and stated "[o]nce improper evidence of any kind injects an arbitrary factor into the jury's consideration, this Court cannot uphold the death sentence under § 16-3-25(C)(1)" and "a review for harmless error is unnecessary because by definition, evidence that implicates an arbitrary factor is prejudicial." *Id.* at 490, 640 S.E.2d 454. Although the Court's lead opinion was silent as to the applicability of harmless error analysis, in the decade since *Burkhart* was decided, the *Burkhart* concurrence has inexplicably been construed by some as the Court's holding.

In this PCR matter, Petitioner relies on the concurrence in *Burkhart*, which was a direct appeal, to argue that prejudice must necessarily be presumed in a PCR setting whenever a violation of section 16-3-25(C)(1) occurs.

We now clarify *Burkhart* and flatly reject the suggestion that a violation of section 16-3-25(C)(1) precludes a harmless error analysis in all circumstances. As previously noted, section 16-3-25(C)(1) was enacted in the wake of *Furman* and requires the Court to determine whether a sentence of death "was imposed under the influence of passion, prejudice, or any other arbitrary factor." The constitutional concerns this statute was enacted to address relate broadly to the procedural process through which juries arrive at sentencing conclusions during the penalty phase of a capital trial—namely, a bifurcated sentencing proceeding guided by specified aggravating and mitigating factors. Neither the Supreme Court in *Furman* nor the South Carolina General Assembly in the wake of *Furman* envisioned this statute as requiring this Court to evaluate for arbitrariness every infinitesimal evidentiary ruling throughout a lengthy death penalty trial.

The parameters of section 16-3-25(C)(1) are broad, and in some cases, the improper factor may also be a structural error. In such a circumstance, a harmless error analysis is not permitted. Conversely, a section 16-3-25(C)(1) violation may be evidence-based and the error's "influence" on the trial (or lack thereof) may be properly assessed by way of a harmless error analysis. We hold that section 16-3-25(C)(1) requires reversal of a death sentence only when the death sentence is *influenced* by an arbitrary factor; not every irrelevant piece of evidence introduced during the course of a sentencing proceeding may be viewed as *influencing* the jury's decision. Whether improperly admitted evidence influenced the outcome

must be determined on a case by case basis, and where the error is deemed harmless beyond a reasonable doubt, reversal is not required.

In any event, *Burkhart* provides no support for Petitioner's claims in this matter, as this is a PCR claim, which is evaluated under the two-pronged approach of *Strickland v. Washington*, 466 U.S. 668 (1984). "When challenging a death sentence, a petitioner must show that 'there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Jones v. State*, 332 S.C. 329, 341, 504 S.E.2d 822, 828 (1998) (quoting *Waldrop v. Jones,* 77 F.3d 1308, 1312 (11th Cir. 1996)).

In this regard, the PCR court found there was "no reasonable probability of a different result if a few pages of questioning on this issue during a multi-day sentencing hearing had been excluded." We agree. *See Franklin v. Catoe*, 346 S.C. 563, 552 S.E.2d 718 (2001) (finding ineffective assistance of counsel claims based on statutory violations in capital sentencing procedures are subject to both the deficiency and the prejudice prongs of the *Strickland* analysis). Because the evidence of guilt and aggravating factors is overwhelming,[8] there is ample evidence to support the PCR court's determination that Petitioner failed to establish prejudice. *Cf. Humphries v. State*, 351 S.C. 362, 376, 570 S.E.2d 160, 168 (2002) (finding petitioner was not prejudiced by solicitor's improper comments in the sentencing phase of a capital murder trial where there was strong evidence of guilt and the petitioner presented a full mitigation case).

Accordingly, we affirm the denial of PCR.


**AFFIRMED.**

**BEATTY, C.J., FEW, JAMES, JJ., and Acting Justice James E. Moore, concur.**

---

[8] The facts of the crime are especially heinous, as described above. Evidence pointing to Petitioner as the murderer was overwhelming, including eyewitness testimony and other evidence linking Petitioner to the murder and arson.