# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Terry Williams, Petitioner.

Appellate Case No. 2018-001365

———————

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

———————

Appeal from Williamsburg County
R. Knox McMahon, Circuit Court Judge

———————

Opinion No. 27967
Heard October 30, 2019 – Filed May 13, 2020

———————

## REVERSED AND REMANDED

———————

Appellate Defender Kathrine Haggard Hudgins, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General Megan Harrigan Jameson, and Assistant Attorney General Mark Reynolds Farthing, all of Columbia; and Solicitor Ernest Adolphus Finney III, of Sumter, for Respondent.

———————

**JUSTICE JAMES:** Terry Williams shot and killed Larry Moore (Victim) and shot and wounded Reva McFadden. Williams was indicted for murder, assault and

battery of a high and aggravated nature (ABHAN), and possession of a weapon during the commission of a violent crime. He maintained he acted in self-defense. A jury convicted him of voluntary manslaughter (a lesser-included offense of murder), ABHAN, and the weapon charge. The court of appeals affirmed. *State v. Williams*, Op. No. 2018-UP-176 (S.C. Ct. App. filed May 2, 2018).

We granted Williams a writ of certiorari to determine whether the court of appeals erred in affirming the trial court's ruling allowing the State to impeach McFadden on redirect examination with details of two previous instances of domestic violence between Williams and McFadden. We hold the trial court erred in allowing the State to elicit unfairly prejudicial details of the domestic violence incidents. The error was not harmless; therefore, we reverse the court of appeals and remand for a new trial.

# I.

The shooting occurred shortly after midnight on November 10, 2013, in the parking lot of Viola's Place, also known as "Celestine's," a bar in Williamsburg County. Williams and McFadden had been together for fifteen years, were married for the last five of those years, and have five children together. They had been separated for approximately one year at the time of the shooting. Victim and McFadden had been dating for approximately nine months. Evidence in the record indicates Williams was still in love with McFadden and was upset over her growing relationship with Victim.

After the shooting, Williams fled the scene in his vehicle, parked it outside his cousin's home, and hid in the woods for the rest of the night. He turned himself into law enforcement later that day and was eventually indicted for murder, ABHAN, and possession of a weapon during the commission of a violent crime.

A. Pre-trial Immunity Hearing

Williams moved for immunity pursuant to the Protection of Persons and Property Act.[1] His immunity hearing was held the day before his jury trial began. Williams argued he was immune from prosecution under the stand-your-ground

---

[1] *See* S.C. Code Ann. §§ 16-11-410 to -450 (2015); § 16-11-450(A) ("A person who uses deadly force as permitted by the provisions of this article or another applicable provision of law is justified in using deadly force and is immune from criminal prosecution and civil action for the use of deadly force . . . .").

provisions of subsection 16-11-440(C).[2] Even though Williams does not appeal the trial court's denial of immunity, McFadden's testimony from the immunity hearing gives context to her trial testimony and the trial court's evidentiary rulings that are the subject of this appeal.

Williams called McFadden as a witness during the immunity hearing.[3] She testified that on the night of the shooting, she and Victim were inside the club shooting pool and socializing. She testified Victim's mood darkened when Williams entered the bar, ordered a drink, and walked back outside. McFadden asked Victim what was wrong, and Victim responded he was "tired of [Williams] mean mugging." According to McFadden, "mean mugging" means giving someone dirty looks. McFadden told Victim to ignore Williams, but Victim told her he was going outside to "see what [Williams] wants to do." McFadden begged Victim to stay inside the bar, but Victim refused and walked outside. Moments later, McFadden followed Victim outside into the parking area, where Victim was standing near the front of Williams' vehicle, with Williams behind the open driver's door about ten feet away from Victim. McFadden testified Victim was complaining angrily to Williams about Williams looking at him, and in response, Williams was telling Victim "back up man, just leave it alone, back up, back up." McFadden testified she attempted to step in front of Victim and Williams started shooting.

As defense counsel was questioning McFadden about the shooting, he asked McFadden to describe Williams, and she replied, "[Williams] is a nice person, you know, quiet person, real quiet person, a self-person, don't bother nobody really." Since Williams had the burden of establishing the elements of self-defense (save the duty to retreat) under subsection 16-11-440(C), defense counsel had to establish that Williams was reasonably in fear for his life immediately before the shooting. McFadden testified Victim was "very, very furious, very mad" at Williams. She also

[2] "A person who is not engaged in an unlawful activity and who is attacked in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16-1-60." S.C. Code Ann. § 16-11-440(C) (2015).

[3] It is apparent from McFadden's testimony during both the immunity hearing and during trial that her sympathies lay with Williams, as her testimony generally supported Williams' claim of self-defense.

testified she had known Williams for fifteen years, knew how to gauge his emotions, and that Williams seemed afraid for his life.

On cross-examination by the State during the immunity hearing, after McFadden acknowledged she described her husband on direct examination as quiet, loving, and sweet, the State asked McFadden if Williams was the same man who (1) pulled an AK-47 on her during an argument eleven months before the shooting and (2) pulled a .22 caliber pistol on her during another argument six months before the shooting. McFadden admitted those two incidents occurred and that she called the police both times. The trial court denied Williams' motion for immunity, and the case proceeded to trial the next day.

After jury selection, Williams moved to exclude testimony concerning the two incidents. Defense counsel stated, "I understand the State's position was potentially that I may have opened the door [during the immunity hearing] when I asked the witness about . . . the defendant's character, whether or not he has a character for violence or anything of that nature. . . . I'm not planning on opening the door [in front of the jury]. I tell you very candidly I'm not planning on doing that again." The trial court instructed the State to request an in camera hearing prior to introducing evidence of any other bad acts committed by Williams.

B. Trial Testimony

Since the burden of proof shifted to the State once the jury trial began, McFadden was called as a prosecution witness during trial. Her description of the events leading up to the shooting basically tracked her testimony during the immunity hearing. McFadden testified that by the time she went outside after Victim, Victim and Williams were already exchanging words by Williams' vehicle. She testified several others were present at the time. Tabitha Greene was one of the others present.

Greene testified Victim and McFadden walked to McFadden's truck, walked back inside the bar, and came back outside within moments. Greene testified Victim walked over to Williams, stood in front of Williams with his arms crossed, and stared at Williams, which prompted Williams to ask Victim, "[W]hat the f**k are you looking at?" Greene testified Victim responded, "[T]hese are my f**king eyes, I can look where I want to look." Greene testified Williams replied, "Okay," and then dropped his head and walked away. Greene testified Victim then told McFadden several times to go back inside the bar. Greene testified she went inside because she was afraid there would be an altercation. Only Williams, Victim, and McFadden remained outside.

Returning to McFadden's testimony, McFadden testified Williams walked towards his vehicle with Victim following him. McFadden testified Victim said to Williams, "[W]hat you want to do, I'm tired of you, I'm tired of seeing you everywhere I go, I'm tired, what you want to do[?]" McFadden testified Williams stood next to his vehicle behind the open driver's door and responded, "[G]o on, back up, just back up, don't come close to me, back up." McFadden testified she saw that Williams had a gun, so she tried to step between the two men. She testified Williams fired approximately ten shots and Victim fell to the ground. Williams fled the scene in his vehicle, and McFadden drove Victim to the hospital. Victim did not survive. An autopsy revealed Victim had been shot five times. McFadden was shot once in her left foot.

Under cross-examination by defense counsel, McFadden testified she had known Williams for fifteen years and could tell when he was happy, sad, and scared. She further testified under cross-examination:

Q: Yesterday[, during the pre-trial immunity hearing,] I was very specific in the questions that I asked you, very specific, and I asked you, looking at your husband, knowing his face, knowing him for 15 years, how did he appear that night? What did you say yesterday when I asked that very specific question?

A: I'm thinking that I said he, he was scared. I know he was scared; that's what I'm saying.

Q: And that was just yesterday when I said ---

A: Yes.

Q: --- specifically asked you, that night ---

A: Yes.

Q: --- when [Victim] was in front of him ---

A: Yes.

Q: --- hands raised ---

A: Yes.

Q: --- [Williams] saying back away ---

**A:** Yes.

**Q:** I asked you, what was your husband's demeanor, the man you knew, how was he acting that day, was your husband afraid?

**A:** He was scared.

**Q:** He was scared. *Tell me why he was scared based upon the person, you know, for 15 years knowing when he's happy, when he's sad, things of that nature.*

**A:** *Because he, he really never been in a confrontation in his whole entire life with anyone in an argument. He tries to stay away from people 'cause he's scared, and that's why when I say he always take his gun because he be scared.*

(emphasis added). McFadden's last response is the focal point of this appeal.

During redirect examination by the State, McFadden confirmed her testimony that Williams was not known to get into any confrontations. The State then requested and was granted an in camera hearing, during which the State argued it should be able to introduce evidence of the two prior incidents of domestic violence between McFadden and Williams to impeach McFadden's testimony regarding Williams' "propensity for or the lack of propensity [for] violence."

The State argued to the trial court that the details of the two prior incidents were admissible under Rule 404(b) of the South Carolina Rules of Evidence to establish Williams' intent and to establish the shooting was not a mistake or an accident. The State also argued Williams opened the door to introducing details of the incidents pursuant to Rule 404(a)(1), SCRE. The State asserted defense counsel's questions of McFadden were designed to elicit testimony about Williams' non-confrontational character, McFadden's testimony in response to those questions spoke to Williams' non-confrontational character, and the State should be allowed to rebut this character evidence with evidence of Williams' confrontational character.

In response, defense counsel agreed McFadden should not be allowed to mislead the jury with her testimony that Williams had never been in a confrontation with anyone. However, defense counsel argued his questions were not designed to elicit a response from McFadden that Williams was peace-loving and non-confrontational, and counsel asserted Williams would suffer unfair prejudice if the State were allowed to introduce details of the two prior incidents to impeach

McFadden.  Counsel argued the State's "questioning should be tailored just to impeach [McFadden] for telling something that was not true."

Our disposition of this appeal turns upon the trial court's ruling that <u>defense counsel's questions</u> did not open the door to the State's introduction of contrary character evidence.  After having the court reporter play back the questions asked by defense counsel and the answers given by McFadden, the trial court ruled defense counsel's questions were not designed to elicit testimony from McFadden that Williams was a non-confrontational person.  Rather, the trial court ruled <u>McFadden's answers</u> to the questions opened the door; explaining further, the trial court stated, "[McFadden] can't have it both ways.  <u>She</u> can't have [Williams] over there peaceful, never having an argument with anyone, and come in here and testify before a jury and mislead the jury that's the truth when she's been a victim otherwise."  (emphasis added).

The trial court allowed the State to question McFadden about the details of the prior domestic violence incidents for three reasons: (1) Rule 404(a)(1) permitted detailed questioning on redirect to rebut McFadden's testimony that Williams was a peaceful, non-confrontational person; (2) Rule 404(b) permitted questioning on redirect to establish Williams' intent and to establish the shooting of Victim was not a mistake or an accident; and (3) McFadden had given untrue testimony, and the State should be allowed under Rule 607 to impeach McFadden by eliciting testimony on redirect to establish she had not told the truth on cross-examination.

When the trial court concluded its ruling, the jury returned, and the State resumed redirect examination of McFadden:

**Q:**  Ms. McFadden, when we left off I asked you was it your sworn testimony that your husband was never known to get in any kind of confrontation with another person during his entire life in your response to me.  Was that your testimony, correct?

**A:**  When I said that I was meaning with someone else otherwise me.

**Q:**  Oh, okay.  So you want to clarify that again.  We want to make further clarification.

**A:**  Can I?

**Q:**  Yeah.  In fact, he got into a confrontation with you about six months before the shooting, right?  Didn't your husband ----

**A:** Most likely, we always stayed in confrontation, me and him.

McFadden then confirmed the details of the two prior incidents, specifically that Williams presented a firearm during both incidents and that McFadden called the police for assistance. Williams again objected and again argued the State's redirect examination of McFadden about the prior incidents should have ceased after McFadden's testimony clarified that Williams had never been in any confrontations with people other than her. The trial court overruled Williams' objection. The jury found Williams not guilty of murder but found him guilty of voluntary manslaughter, ABHAN, and possession of a weapon during the commission of a violent crime.

Williams appealed, and the court of appeals affirmed. *State v. Williams*, Op. No. 2018-UP-176 (S.C. Ct. App. filed May 2, 2018). The court of appeals held the trial court did not abuse its discretion in allowing the State to question McFadden about the two prior domestic violence incidents pursuant to Rule 404(a)(1). We granted Williams a writ of certiorari to review the court of appeals' decision.

## II.

The trial court ruled the details of the two prior domestic violence incidents were admissible under Rule 404(a)(1), Rule 404(b), and Rule 607. Williams argues this was reversible error. The trial court conducted only a cursory analysis of Rule 404(b), and it is apparent the trial court primarily based its ruling upon Rule 404(a)(1) and Rule 607. In fact, the State has not advanced any argument on Rule 404(b)'s applicability and acknowledges in its brief to this Court that the trial court did not base its ruling on Rule 404(b). Therefore, we will limit our discussion to the applicability of Rule 404(a)(1) and Rule 607 to this case, and we will review the importance of proportionality and Rule 403 to a proper analysis of the admissibility of the details of the prior domestic violence incidents.

A. Rule 404(a)(1), SCRE

Rule 404(a)(1) provides:

**(a) Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

**(1) Character of Accused.** Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same[.]

Plainly, before the State may rebut evidence of a character trait of the accused, the accused must first offer evidence of that character trait into the trial. The rule does not allow rebuttal character evidence from the State when a witness other than the accused gratuitously testifies about a character trait of the accused. Here, in ruling Williams' questions of McFadden were not designed to elicit a response from McFadden about a character trait of Williams—that Williams was peaceful and non-confrontational—the trial court ruled the witness, not the accused, placed a trait of Williams' character in issue.

As noted, the trial court ruled defense counsel's questions of McFadden were not designed to elicit testimony of Williams' peaceful and non-confrontational character. The State disagrees with the trial court and argues evidence of Williams' confrontational nature and his propensity to brandish a firearm were fair game because defense counsel's questions were designed to elicit a response from McFadden that Williams was peaceful and non-confrontational. In other words, the State claims defense counsel opened the door to rebuttal character evidence. "It is firmly established that otherwise inadmissible evidence may be properly admitted when opposing counsel opens the door to that evidence." *Bowman v. State*, 422 S.C. 19, 40, 809 S.E.2d 232, 243 (2018) (quoting *State v. Page*, 378 S.C. 476, 482, 663 S.E.2d 357, 360 (Ct. App. 2008)). Although evidence of a defendant's character is not generally admissible to prove his propensity to act accordingly, "when the accused offers evidence of his good character regarding specific character traits relevant to the crime charged, the solicitor has the right to cross-examine him as to particular bad acts or conduct." *State v. Young*, 378 S.C. 101, 106, 661 S.E.2d 387, 389 (2008).

"The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001). "An abuse of discretion occurs when the trial court's ruling is based on an error of law[.]" *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000) (quoting *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000)). Before we reach the question of whether the trial court abused its discretion in allowing evidence of the details of the prior incidents under Rule 404(a)(1), we must first determine whether the trial court abused its discretion in concluding defense counsel's questions were not designed to elicit evidence of Williams' peaceful and non-confrontational character. If we conclude the trial court did not abuse its discretion in this regard, we have no choice but to rule the trial court committed an error of law in invoking Rule 404(a)(1) as a basis for allowing the introduction of the details of the prior incidents.

To repeat, during the immunity hearing, defense counsel asked McFadden to generally describe Williams, and McFadden responded that Williams was "nice," "quiet," and did not bother anyone. This loosely-worded question and McFadden's answer to it opened the door for the State to provide at least some rebuttal evidence of Williams' confrontational character during the immunity hearing. When the jury trial began the next day, defense counsel acknowledged to the trial court that he may have opened the door to character evidence during the immunity hearing, but he was adamant he would not open the door during trial. During trial, defense counsel elicited testimony from McFadden that it appeared to her that Williams was in fear of death at the hand of Victim. Then the following exchange occurred:

> **Q:** He was scared. Tell me why he was scared based upon the person, you know, for 15 years knowing when he's happy, when he's sad, things of that nature.

> **A:** Because he, he really never been in a confrontation in his whole entire life with anyone in an argument. He tries to stay away from people 'cause he's scared, and that's why when I say he always take his gun because he be scared.

We hold the trial court did not abuse its discretion in ruling Williams did not open the door to evidence of his confrontational character or his propensity to brandish a firearm when in a confrontation. That ruling removed Rule 404(a)(1) from the evidentiary equation; therefore, the trial court committed an error of law in relying upon Rule 404(a)(1) to allow the State to introduce evidence of Williams' confrontational character.

B. Rule 607, SCRE

The trial court also cited Rule 607 as a basis for allowing the introduction of the details of the prior incidents between Williams and McFadden. Rule 607 provides, "The credibility of a witness may be attacked by any party, including the party calling the witness." One obvious way to impeach a witness is to elicit testimony from that witness that establishes she previously gave false or misleading testimony on the same subject matter. McFadden's testimony that Williams had "never been in a confrontation in his whole entire life with anyone in an argument" was not true, for Williams had been in two confrontations with McFadden just eleven months and six months before the shooting. Williams rightly concedes the State should have been allowed to elicit testimony from McFadden to establish her prior testimony was not true. Williams argues the trial court instead allowed the State to go far beyond that point and introduce inadmissible propensity evidence. The

question becomes how far the trial court should have allowed the impeachment to go. Rule 403 provides the framework for answering that question.

## C. Rule 403, SCRE

The concept behind Rule 403 is clear: if the probative value of the evidence sought to be admitted "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," the trial court, upon proper objection, may exclude the evidence. *See* Rule 403, SCRE. The Rule 403 concern most often invoked is "the danger of unfair prejudice." In the context of Rule 403, "[e]vidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis, such as an emotional one." *State v. Wilson*, 345 S.C. 1, 7, 545 S.E.2d 827, 830 (2001).

Whether the subject is contrary character trait evidence under Rule 404(a)(1) or impeachment of a witness under Rule 607, Rule 403 requires the evidence offered to be proportional to the evidence that gave rise to its admissibility. We have guarded against "thinly-veiled attempt[s] to show propensity" initiated under the guise of an attempt at impeachment. *See Young*, 378 S.C. at 106, 661 S.E.2d at 390; *State v. Heyward*, 426 S.C. 630, 637, 828 S.E.2d 592, 595 (2019). We have emphasized proportionality in "opening-the-door" settings as well. *See Bowman*, 422 S.C. at 40, 809 S.E.2d at 243-44 ("Once the defendant opens the door, the solicitor's invited response is appropriate so long as it does not unfairly prejudice the defendant." (quoting *Ellenburg v. State*, 367 S.C. 66, 69, 625 S.E.2d 224, 226 (2006))); *Heyward*, 426 S.C. at 637, 828 S.E.2d at 595 ("Testimony in response must be 'proportional and confined to the topics to which counsel had opened the door.'" (quoting *Bowman*, 422 S.C. at 42, 809 S.E.2d at 244)); *see also State v. Robertson*, 205 A.3d 995, 1004 (Md. 2019) ("The doctrine of opening the door has limitations. It allows for the introduction of otherwise inadmissible evidence, but only to the extent necessary to remove any unfair prejudice that might have ensued from the original evidence." (quoting *Little v. Schneider*, 73 A.3d 1074, 1082 (Md. 2013))); *Khan v. State*, 74 A.3d 844, 856 (Md. Ct. Spec. App. 2013) ("While the proverbial door was opened to the disputed testimony, it remained for the trial court to balance its probative value against its prejudicial nature . . . .").

When the State initially challenged McFadden about her untruthful testimony that Williams had never been in a confrontation in his entire life, McFadden tried to qualify her testimony and stated, "[w]hen I said that I was meaning with someone else otherwise me." She further tried to qualify her testimony by stating, "[W]e always stayed in confrontation, me and him."

Williams argues that at this point, no further impeachment of McFadden was warranted because McFadden had admitted her testimony on cross-examination was not true. Williams claims the trial court abused its discretion in allowing the State to elicit the details of the two domestic violence incidents, especially the details that Williams presented a firearm on both occasions and that McFadden called the police on both occasions. Williams argues any probative value of these details was substantially outweighed by the danger of unfair prejudice, as Williams was standing trial for shooting two people. We agree. We question whether these details had any probative value in this case, and we hold the introduction of these details had "an undue tendency to suggest a decision on an improper basis." *Wilson*, 345 S.C. at 7, 545 S.E.2d at 830.

The trial court properly allowed the State to ask McFadden if she had been involved in two prior confrontations with Williams, as this would impeach her previous testimony that Williams had never been in any confrontations with anyone. However, the trial court erred in allowing the State to elicit the details of the incidents, primarily that Williams presented a firearm and that police were called.

## III.

We also hold the erroneous introduction of evidence of these details of the prior incidents was not harmless. Evidence of Williams' guilt was certainly not overwhelming. The severity of the unfair prejudice was amplified because the indicted offenses centered upon Williams' use of a firearm to kill one person and wound another. The inadmissible details of the prior incidents amounted to extremely prejudicial propensity evidence, which likely eroded Williams' theory of self-defense and likely influenced the jury to base its verdict on improper considerations.

We reverse Williams' convictions and remand for a new trial on the charges of voluntary manslaughter, ABHAN, and possession of a weapon during the commission of a violent crime.

**REVERSED AND REMANDED.**

**BEATTY, C.J., KITTREDGE, HEARN and FEW, JJ., concur.**