**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-11**

JOHN R. WOOD,

                    Petitioner – Appellant,

         v.

BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections;
LYDELL CHESTNUT, Deputy Warden of Broad River Correctional Institution
Secure Facility,

                    Respondents – Appellees.

Appeal from the United States District Court for the District of South Carolina, at Rock
Hill.  David C. Norton, District Judge.  (0:12−cv−03532−DCN)

Argued:  October 29, 2021                          Decided:  March 2, 2022

Before MOTZ, DIAZ, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Motz and
Judge Richardson joined.

**ARGUED:**  Elizabeth Anne Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., for
Appellant.  Melody Jane Brown, OFFICE OF THE ATTORNEY GENERAL OF SOUTH
CAROLINA, Columbia, South Carolina, for Appellees.  **ON BRIEF:**  Emily C. Paavola,
JUSTICE 360, Columbia, South Carolina, for Appellant.  Alan Wilson, Attorney General,
Donald J. Zelenka, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL
OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees.

DIAZ, Circuit Judge:

John R. Wood shot and killed an on-duty police officer. A South Carolina jury convicted him of murder and sentenced him to death. Having exhausted his state remedies, Wood petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He now appeals the district court's grant of summary judgment to the state officials Bryan P. Stirling and Lydell Chestnut.

We granted a certificate of appealability on one issue: whether Wood's trial counsel provided ineffective assistance by failing to object to the State's introduction and use of prison-conditions evidence at the penalty phase. We find that the state postconviction court's denial of relief didn't constitute an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Thus, we affirm.

I.

A.

In December 2000, Trooper Eric Nicholson encountered Wood while patrolling I-85 near Greenville, South Carolina. Wood was on a moped. After Nicholson confirmed with another officer that mopeds couldn't be operated on the interstate, he activated his lights and siren to pull Wood over. But Wood didn't stop. Instead, he led the officer off the highway and onto a frontage road. Nicholson sped up to get beside Wood and used his car to block the moped's progress. Wood came to a stop near the driver-side window of Nicholson's car. Within seconds, Wood drew a gun and shot Nicholson five times through

the window.  Having fatally wounded the officer, Wood fled and met up with his girlfriend, who had been following him in her Jeep.

When police caught up with the pair, a high-speed chase ensued.  Wood's girlfriend drove while Wood fired at pursuing officers from the passenger seat.  He shot one of the officers in the face, but the officer survived.  As the chase continued, the Jeep ran several cars off the road, striking one.  And when the Jeep stalled, Wood hijacked a truck at gunpoint—this time, he jumped into the driver's seat.  Officers eventually cornered and arrested Wood.

## B.

A South Carolina grand jury indicted Wood for Nicholson's murder and possession of a weapon during the commission of a violent crime.  The State gave notice it would seek the death penalty, and Wood's capital trial began in February 2002.  Attorneys John Mauldin, James Bannister, and Rodney Richey represented him.  The jury returned a guilty verdict on both counts.  The penalty phase began two days later.

The State began the penalty phase by reintroducing all the evidence from the guilt phase for the jury's consideration.  The rest of its penalty case consisted of Wood's criminal record and six witnesses.  The State read Wood's record to the jury, which included convictions for shoplifting, grand theft, burglary, obtaining controlled substances by fraud, and conspiring to use fraudulent identification in connection with counterfeit securities.

As for its witnesses, the State spent the bulk of its time examining Jimmy Sligh, a 20-year employee of the South Carolina Department of Corrections.  Sligh testified on "the

3

difference between life in prison without parole versus the punishment of death."[1] J.A. 317. Sligh described a prison as being "like a mini city." J.A. 323. He explained that prisoners in the general population typically have access to several privileges, assuming good behavior. These privileges include access to vocational and work programs, recreational activities, freedom of movement around their cell block, and full-contact family visits.

In contrast, Sligh explained that death row prisoners are on 23-hour lockdown, have no access to work programs, and have constrained, no-contact family visits. Still, Sligh testified that violence is more limited on death row where prisoners spend their time either behind bars or restrained.

At no point did Wood's counsel object to Sligh's testimony. Instead, on cross-examination, counsel highlighted the danger of prison life in the general population. Counsel asked whether Wood's small stature and race (Wood is white) would be "strikes" against him in the general population, and Sligh agreed that Wood's "safety would be at the highest it could be" if placed on death row. J.A. 350.

Four other State witnesses testified about the day of the crime and Wood's arrest. One officer talked about his experience as a first responder. Another recounted being shot in the face by Wood during the pursuit. A third spoke on Wood's apparent lack of remorse after being captured. And the victim whose truck Wood stole discussed being hijacked at gunpoint.

---

[1] We refer to such testimony as "prison-conditions evidence."

4

The State concluded by calling Misty Nicholson, Trooper Nicholson's widow, who recounted their relationship and the lasting impact of Nicholson's death. Mrs. Nicholson told the jury about how they "grew up together" and married after five years of dating. J.A. 392. She described how they once "planned to have children" but now she "come[s] home to an empty house." J.A. 394–95. "Every aspect of [her] life ha[d] been changed." J.A. 394.

Mrs. Nicholson also related how Nicholson's death was "really difficult" for his parents. J.A. 393. She said Nicholson's father was "not in the best . . . health," and the death "put a real strain on h[im]." J.A. 394. Finally, she detailed the day Nicholson died and how she arrived at the hospital to find him gone. "From that point on [she] had to live with what happened." J.A. 398.

Wood then presented his mitigation case, focusing on his mental health issues (and their root causes) and his adaptability to confinement. He offered expert testimony from a social worker and a psychiatrist, who both examined Wood and agreed that he suffered from paranoid-personality disorder. Wood's psychiatrist went further, diagnosing him with bipolar disorder. And when considered with his hallucinations and delusions of grandiosity, the psychiatrist said Wood exhibited symptoms of psychosis.

The State called its own forensic psychiatrist in rebuttal, who had evaluated Wood and reviewed his medical records. Contrary to Wood's experts, the State's psychiatrist testified that Wood suffered only from an antisocial personality disorder and substance-abuse issues. As support, he noted Wood's psychiatric evaluation conducted at the jail just

5

days after Nicholson's murder, which found no mental illness other than an antisocial personality disorder.

Wood's adaptability-to-confinement presentation proceeded in two parts. First, he offered video footage of his good behavior in jail over the previous fourteen months. Second, he called James Aiken, a former South Carolina prison warden, as an expert to testify to Wood's "future prison adaptability" and a "risk assessment of prisoners." J.A. 468–69.

Aiken briefly explained his impression that Wood was "compliant to orders" based on his review of prison records and an interview of Wood. J.A. 470. Given Wood's cooperative and nonviolent behavior in prison, Aiken opined Wood would pose no risk to prison staff if confined for the rest of his life.

Most of Aiken's testimony, however, compared life in the general population of a maximum-security prison (where Wood would serve a life sentence) versus death row—i.e., prison conditions. Though a layperson might think an inmate is better off in the general population, Aiken said, "that's not necessarily the case." J.A. 473. A death row inmate gets "peace and quiet" in their single cell, while general-population inmates are "dealing with [multiple] security threat groups." *Id.*

Aiken explained such threats in the general population came from "predator groups," which he defined as "people that are constantly trying to take control of you. . . . people that have killed over and over and over again." *Id.* And Aiken agreed that Wood's size and race would make him an "easier target" and "more likely to be subjected to persons

6

inflicting violence upon him" in the general population. J.A. 475. A life sentence would be "very difficult for [Wood]," according to Aiken. J.A. 476.

At closing, the State featured the prison-conditions evidence. It argued that a life sentence wouldn't be "serious business for . . . Wood." J.A. 599. That's because "going to prison is like being in a big city – in a little city. You've got a restaurant. . . . You get contact visits with your family. . . . You've got a social structure. You've got freedom of movement. . . . Thirty or forty acres to live in. [You can w]atch ball games on the T.V." J.A. 599–600. The State told the jury that life in prison for Wood would be "a change of address and nothing more." J.A. 600.

Wood's counsel didn't object. Instead, counsel challenged Sligh's framing of prison as "soft." J.A. 614. And counsel referred to Aiken's testimony, explaining that "prisons contain violent, dangerous people for long periods of time." J.A. 616.

The case went to the jury. On the second day of deliberations, the jury asked to review the competing psychiatrists' testimony. After having this testimony played back, the jury informed the court of an eleven-to-one deadlock. The court gave the jury a modified *Allen*[2] charge, instructing them to continue deliberations. The next morning, the jury returned a verdict of death.

The Supreme Court of South Carolina affirmed Wood's convictions and sentence on direct appeal. *State v. Wood*, 607 S.E.2d 57, 62 (S.C. 2004), *cert. denied*, 545 U.S. 1132 (2005).

---

[2] *Allen v. United States*, 164 U.S. 492 (1896).

C.

Wood filed for postconviction relief in state court. Among several issues, Wood raised ineffective assistance of his trial counsel for their failure to object to the State's introduction and use of prison-conditions evidence at the penalty phase.

The state postconviction court held an evidentiary hearing at which Wood's trial counsel testified. Mauldin, lead trial counsel, said he had no strategic reason for failing to object to the State's prison-conditions evidence and the use of such evidence in closing. While Mauldin first suggested that he thought Sligh would testify only about adaptability-to-confinement evidence, the State on cross refreshed his memory with the trial transcript. Mauldin had expressly decided not to object to Sligh's "conditions of confinement" testimony after huddling with the rest of the defense team.

Bannister and Richey also testified. Both agreed that they knew of no strategic reason not to object to the evidence but that such an objection was Mauldin's to make.

The state court dismissed Wood's petition. On the prison-conditions evidence, it analyzed South Carolina case law to explain why such evidence is "problematic." J.A. 1217. And applying *Strickland*,[3] the court found Wood's counsel were deficient for not objecting to the evidence. But that deficiency didn't prejudice Wood. Because there was a "relative equality of presentation" on the improper-but-admitted evidence, the state court determined that there was no reasonable probability of a different result when considering the admissible evidence. J.A. 1226.

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

Wood appealed, but the Supreme Court of South Carolina declined review.

D.

Wood then petitioned for federal habeas relief in the District of South Carolina.[4] He raised a host of issues, including his trial counsel's failure to object to the prison-conditions evidence. The State moved for summary judgment. A magistrate judge recommended granting the State's motion.

Applying 28 U.S.C. § 2254(d)'s review standard to Wood's *Strickland* claim on the prison-conditions evidence, the magistrate judge agreed that "admission of an arbitrary factor, such as conditions of confinement, may invite prejudice." *Wood v. Stirling*, No. 12-cv-3532, 2018 WL 4701388, at *21 (D.S.C. Oct. 1, 2018). Still, she found that "nothing in federal jurisprudence requires a finding that admission of evidence of conditions of confinement prejudiced [Wood]." *Id.*

The magistrate judge determined the state postconviction court had properly applied *Strickland* when it weighed the prison-conditions evidence's impact on the verdict. Wood had also questioned the state court's reliance on the aggravated facts of his crime while ignoring the jury's long deliberations. But the magistrate judge found no evidence tying the jury's deadlock to the admission of prison-conditions evidence or to mitigating evidence that the state court didn't consider.

---

[4] The federal proceedings were stayed while Wood pursued a second postconviction petition in state court. The state court granted summary judgment against Wood on his second petition, finding it improperly successive and untimely.

9

Wood objected to the magistrate judge's report and recommendation. The district court, however, overruled those objections. *Wood v. Stirling*, No. 12-cv-3532, 2019 WL 4257167, at \*12–14 (D.S.C. Sept. 9, 2019).

On the prison-conditions evidence, the district court agreed that the state court had properly applied *Strickland* by examining the evidence's prejudicial effect. Rejecting Wood's other objections, the district court found that no Supreme Court precedent required a court to consider the length of jury deliberations in a *Strickland*-prejudice analysis. Nor was the district court persuaded that the State's repetition of the prison-conditions evidence in closing needed to be considered, either. The district court accordingly entered judgment for the State.

We granted a certificate of appealability on the *Strickland* claim.

II.

Wood argues that the state postconviction court's refusal to grant relief on his claim that counsel were ineffective for failing to object to the prison-conditions evidence was either an unreasonable application of the Supreme Court's *Strickland* line of cases or based on an unreasonable determination of the facts. We review the district court's denial of habeas relief de novo. *Owens v. Stirling*, 967 F.3d 396, 410 (4th Cir. 2020). And because the state court adjudicated Wood's claim on the merits, we review that denial through the highly deferential lens required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254(d).

We conclude that Wood fails to meet AEDPA's stringent bar for relief.

10

A.

Under AEDPA, we may grant habeas relief on a claim that a state postconviction court rejected on the merits only when the decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Under § 2254(d)(1), a state court's application of Supreme Court precedent is unreasonable "when the court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Owens*, 967 F.3d at 411 (cleaned up). "[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). In other words, we may not grant relief if "it is possible fairminded jurists could disagree" that the state court's decision conflicts with Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), a state court's decision is based on an unreasonable determination of the facts when there "is not merely an incorrect determination, but one 'sufficiently against the weight of the evidence that it is objectively unreasonable.'" *Gray v. Zook*, 806 F.3d 783, 790 (4th Cir. 2015) (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)). We presume the state court's factual findings are sound unless the petitioner "rebuts the 'presumption of correctness by clear and convincing evidence.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)).

And "when a petitioner's habeas corpus claim is based on alleged ineffective assistance of counsel, we review the claim through the additional lens of *Strickland* and its progeny." *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012). "The AEDPA standard and the *Strickland* standard are dual and overlapping, and we apply the two standards simultaneously rather than sequentially." *Id.*

To succeed on an ineffective-assistance claim, a petitioner must show that (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Performance is deficient if it falls below "an objective standard of reasonableness," which is defined by "prevailing professional norms." *Id.* at 688. Prejudice means there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. And a reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.*

"Surmounting *Strickland*'s high bar is never an easy task" for a habeas petitioner seeking relief under § 2254(d). *Richter*, 562 U.S. at 105 (cleaned up). That's partly because "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.*; *see Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

B.

1.

The state postconviction court correctly identified *Strickland* as the appropriate framework to address Wood's claim. It found (as the State concedes) that defense counsel were deficient for not objecting to the prison-conditions evidence. *See Bowman v. State*, 809 S.E.2d 232, 241 (S.C. 2018); *State v. Plath*, 313 S.E.2d 619, 627 (S.C. 1984). But the state court also determined Wood couldn't show prejudice from this deficiency.

Wood argues that the state court's application of *Strickland*'s prejudice test either was objectively unreasonable or resulted in a decision based on an unreasonable determination of the facts. We disagree.

2.

To assess *Strickland* prejudice in capital sentencing, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Wood framed that question for the state court in terms of his counsel's failure to object to the prison-conditions evidence. Thus, put differently, Wood would have been "entitled to relief only if he [could] show that had the [prison-conditions evidence] not been admitted, there is a reasonable probability that at least one juror would have struck a different balance." *Powell v. Kelly*, 562 F.3d 656, 668 (4th Cir. 2009) (cleaned up).

The state court held that Wood hadn't shown "a reasonable probability of a different result." J.A. 1226. It compared the "extremely aggravated" facts of the case against

13

Wood's "limited" mitigation case. *Id.* Wood had done more than "merely murder[]" Trooper Nicholson," the state court said, he wounded another officer and endangered several civilians. *Id.* The state court also noted the "particularly moving" victim-impact evidence and Wood's prior criminal record. *Id.*

As for Wood's mitigation case, the state court explained Wood had called no family members and presented only "relatively mild mental health testimony." *Id.* That latter evidence, the state court determined, showed that Wood didn't suffer from psychosis or delusion at the time of the offense, but had an antisocial personality disorder.

On the prison-conditions evidence, the state court found the defense "was able to score as many points if not more as the [State]," thereby neutralizing any prejudice. *Id.* Wood's counsel had elicited "how tough prison is, how [Wood] would be far more susceptible to danger in general population than on death row, and how [Wood] would likely be at the mercy of predator groups inside the general population of prison given his small stature and older age." *Id.*

According to the state court, both sides "fully joined the issue" and achieved a "relative equality of presentation." *Id.* And "[g]iven the overwhelming evidence in aggravation and the limited evidence in mitigation," admission of the prison-conditions evidence didn't prejudice Wood. *Id.* By the same token, the state court found the closing arguments didn't change this outcome because both sides introduced prison-conditions evidence and argued on the issue.

14

3.

We recently examined a state court's application of *Strickland* to the evidentiary issue before us. In *Sigmon v. Stirling*, we denied habeas relief where a state court found no reasonable probability that, but for defense counsel's failure to object to prison-conditions evidence at the penalty phase, the jury wouldn't have imposed a death sentence. 956 F.3d 183, 193 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1094 (2021).

There, defense counsel first elicited the improper evidence from its own expert. *Id.* Concluding the petitioner hadn't established prejudice, we found that "overwhelming and uncontested evidence of aggravating circumstances" outweighed any potential harm from the prison-conditions evidence. *Id.* Exclusion of such evidence "would have also excluded parts of Sigmon's mitigation case" since the petitioner opened the door on the topic through his expert. *Id.*

The *Sigmon* prejudice analysis informs our decision here. The state postconviction court identified the "extremely aggravated" facts of Wood's crime, along with his criminal history and the "moving" victim-impact evidence, and then weighed the effect of the prison-conditions evidence presented to the jury. J.A. 1226. Though Wood offered a mitigation case based on his mental health, we don't think it was unreasonable for the state court to have found that the substantial aggravating evidence overcame that case. *See, e.g.*, *Morva v. Zook*, 821 F.3d 517, 532 (4th Cir. 2016) ("Even the most sympathetic evidence in the record about [the petitioner's] troubled childhood and mental health does not outweigh the aggravating evidence presented at trial." (cleaned up)).

15

Wood's counterarguments are unpersuasive. He first claims that the state court "failed to appreciate the inherently prejudicial nature" of the prison-conditions evidence and its "central role" in the State's case. Appellant's Br. at 24. To be sure, Sligh's testimony featured prominently in the State's penalty case. Based on the transcript, Sligh's testimony made up more than half of the direct testimony elicited from the State's six penalty-phase witnesses. J.A. 319–46, 352–59. And the State highlighted Sligh's testimony in closing. By contrast, the defense's questioning of Aiken made up less than a fifth of the direct testimony it elicited from all its witnesses. J.A. 464–78.

But the record convinces us that the state court did, in fact, appreciate the troubling nature of the prison-conditions evidence. Before tackling the *Strickland* analysis, the court examined South Carolina case law to explain why such evidence is "problematic" and thus inadmissible. J.A. 1217. And, in a single sentence, it found Wood's trial counsel were deficient under *Strickland* for failing to object to the evidence.

With that conclusion firmly in mind, the state court weighed the effect of the prison-conditions evidence. It determined that there was a "relative equality of presentation by both sides" on this evidence and that the defense "score[d] as many points if not more" than the State. J.A. 1226.

True, the prison-conditions evidence made up a disproportionate share of the new evidence offered by the State during the penalty phase. But the state court found that Wood's counsel countered the State's central premise through more efficient questioning. What's more, the defense opened the penalty phase by telling the jury that "life without parole is perhaps a more punishing penalty." J.A. 297. Taken altogether, the state court

16

could reasonably conclude that the defense met its objective and scored enough points on the prison-conditions evidence to nullify the State's presentation.

Though the state court didn't reach Wood's desired result, we can't say it unreasonably applied *Strickland* when it weighed the prison-conditions evidence and found its effect on the verdict inconsequential.[5]  At bottom, it's precisely this type of inquiry the Supreme Court asks habeas courts to engage in when assessing *Strickland* prejudice.  *See Sears v. Upton*, 561 U.S. 945, 955–56 (2010) (explaining that the prejudice inquiry should be "probing and fact-specific" and will "necessarily require a court to 'speculate'" on the consequences of counsel's errors).

Wood's challenges to the state court's consideration of his mitigation evidence are also unavailing.  Wood argues the court "unreasonably substituted its own judgment discounting [his] mitigation evidence" when considering his criminal history and mental health evidence.  Appellant's Br. at 29.  He also asserts that the court "unreasonably

---

[5] Wood claims the state court's weighing of the prison-conditions evidence can't be reconciled with the result in *State v. Burkhart*, 640 S.E.2d 450 (S.C. 2007), but that argument misses the mark.  In *Burkhart*, South Carolina's high court, without conducting a prejudice analysis, reversed a death sentence on direct review where the State had introduced general prison-conditions evidence over the defendant's timely objection.  *See id.* at 488.  Though the defendant "attempted to counter" the State's prison-conditions evidence with his own, the court found the "entire subject matter injected an arbitrary factor into the jury's sentencing considerations" in violation of a state statute.  *Id.*  Even so, South Carolina's treatment of such evidence on direct review can't control Wood's collateral *Strickland* claim, which requires him to establish prejudice.  *See Bowman*, 809 S.E.2d at 246 ("*Burkhart* provides no support for Petitioner's claims in this matter, as this is a [postconviction relief] claim, which is evaluated under the two-pronged approach of *Strickland*[.]").

17

conflated" Aiken's adaptability and prison-conditions testimony. Appellant's Br. at 31. We disagree.

For starters, the state court's order shows it considered both Wood's criminal history and his mental health evidence. On Wood's criminal history, the court specifically noted his prior record and time spent in prison. It's true, as Wood argues, that the court didn't mention the nonviolent nature of his past crimes or his good behavior while in prison. But that the court wasn't persuaded by this evidence is understandable when considered in context. After all, it assessed Wood's criminal history just after recounting the violent facts of his murder conviction.

Similarly, we reject Wood's contention that the state court unreasonably discounted his mental health evidence. The court found the evidence "relatively mild" because there were no "findings of psychosis or delusion at the time of the offense." J.A. 1226. This conclusion is supported by the State's expert psychiatrist, who said Wood exhibited no mental illness apart from substance abuse and an antisocial personality disorder.

The State's expert explained how he had relied on another psychiatrist's evaluation of Wood just days after Nicholson's murder that revealed neither psychosis nor delusion. So, while Wood's expert psychiatrist attested that he suffered from symptoms of psychosis—even at the time of the offense—the record provides ample support for the state court's decision to instead credit the State's evidence.[6] *See Walters v. Martin*, 18 F.4th

---

[6] Wood's claim that the state court's treatment of his mental health evidence violated *Tennard v. Dretke* also fails. *See* 542 U.S. 274, 284 (2004) (explaining that mitigation evidence need not bear any "nexus to the crime" to be considered). The court didn't

18

434, 444 (4th Cir. 2021) ("We defer to the state court's credibility finding [when] we perceive no stark and clear error with it." (cleaned up)).

Nor do we think the state court unreasonably conflated Aiken's adaptability and prison-conditions testimony. Wood points to the court's statement that "[h]ad counsel objected to the State's evidence on the issue, it would not have been allowed to make its own points along these lines as well." J.A. 1226. Wood claims the court treated Aiken's adaptability testimony (which is admissible[7]) as equivalent to the prison-conditions evidence (which isn't).

There's no dispute that Wood would have been able to present evidence on his adaptability to prison, regardless of the introduction of prison-conditions evidence. But the state court never said otherwise. It said only that Wood wouldn't have been able to make his points "on the *issue*"—the "issue" being "conditions of confinement." *Id.* (emphasis added). And other portions of the court's order show that it understood Aiken testified on Wood's "mentality" and that he'd be "adaptable to prison." *See* J.A. 1162, 1178. In short, we find no indication that the state court conflated Aiken's testimony in the manner Wood suggests, much less that it did so unreasonably.[8]

---

disregard Wood's mental health evidence by finding it "relatively mild." *See* J.A. 1226. Rather, the court's finding informs the weight it gave to Wood's evidence when tempered by the State's rebuttal expert.

[7] *See Skipper v. South Carolina*, 476 U.S. 1, 7 (1986).

[8] Having found the state court reasonably considered the mitigation and prison-conditions evidence, we conclude Wood's claims that the court unreasonably focused on the facts of his crime and the victim-impact evidence are of no moment.

19

Finally, Wood contends the state court failed to reasonably apply *Strickland* because it didn't acknowledge that the jury deliberated over three days and, at one point, appeared deadlocked. According to Wood, this shows that "even a tiny fraction less on the aggravating side of the scale could have made a difference" in the verdict. Appellant's Br. at 35.

Indeed, we've held that the significance of evidence can be "further heightened" when considering the reasonableness of a *Strickland* application if a jury is "initially deadlocked on whether to impose the death penalty." *Williams v. Stirling*, 914 F.3d 302, 319 (4th Cir. 2019). Wood's reliance on *Williams* thus seems apt on its face.

Yet there's good reason why the jury's deadlock is not as telling as Wood suggests. Just before the jurors informed the court that they were deadlocked, they asked to rehear the testimony of the expert psychiatrists. This request suggests that the mental health evidence led to the impasse, not the prison-conditions evidence. Given that there's another reasonable explanation for the jury's indecision having nothing to do with counsel's effectiveness, we won't fault the state court for not expressly considering the jury's deadlock in its prejudice analysis.

## III.

In sum, the state postconviction court properly applied *Strickland* to Wood's ineffective-assistance claim, and in doing so, it wasn't unreasonable in finding no reasonable probability that, but for trial counsel's errors, the jury wouldn't have sentenced Wood to death. The district court's judgment is therefore

20

*AFFIRMED.*