**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-12

MARION BOWMAN, JR.,

Petitioner – Appellant,

v.

BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections; LYDELL CHESTNUT, Deputy Warden of Broad River Correctional Secure Facility,

Respondents – Appellees.

Appeal from the United States District Court for the District of South Carolina, at Beaufort. Terry L. Wooten, Senior District Judge. (9:18-cv-00287-TLW)

Argued: October 28, 2021                    Decided: August 16, 2022

Before NIEMEYER, AGEE, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Rushing wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

**ARGUED:** Teresa L. Norris, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. William Joseph Maye, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Lindsey S. Vann, Megan E. Barnes, JUSTICE 360, Columbia, South Carolina, for Appellant. Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, Melody J. Brown, Senior Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA,

Columbia, South Carolina, for Appellees.

————————————

RUSHING, Circuit Judge:

When the prosecution suppresses favorable evidence material to a defendant's guilt or punishment, it violates the constitutional guarantee of due process. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is "material" when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Materiality is evaluated "in the context of the entire record." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal quotation marks omitted).

Marion Bowman was convicted of murdering Kandee Martin and sentenced to death. During his state post-conviction relief (PCR) and federal habeas proceedings, Bowman argued that the State of South Carolina's failure to produce three pieces of evidence violated his due process rights because he could have used that evidence to impeach prosecution witnesses. Considering the entire record and the overwhelming evidence of Bowman's guilt, every court to address this argument has deemed the undisclosed evidence not material. We agree.

I.

We begin with an overview of the evidence presented during the guilt and penalty phases of Bowman's trial. Then we summarize the state post-conviction and federal habeas proceedings to date.

A. Guilt Phase

Early in the morning on February 17, 2001, firefighters were called to the scene of a car fire. After extinguishing the flames, officers discovered Martin's body in the trunk.

3

An autopsy revealed that Martin had been shot to death before being placed in the trunk. Later that day, officers arrested Bowman. The State charged Bowman with murder and notified him of its intent to seek the death penalty.

### 1. Bowman's Gun Before the Murder

At trial, the State put on evidence that Bowman possessed a gun of the same make and model as the murder weapon on February 16, 2001, the day of the murder. Two witnesses—Travis Felder and Bowman's cousin James Taiwan Gadson—testified that Bowman had purchased a Hi-Point .380 semi-automatic pistol roughly two weeks earlier. On the morning of the murder, Gadson saw Bowman walking out of his house with a limp. Bowman explained to Gadson that he had the gun in his pants and it was cold against his leg. Throughout the day, a group of people—including Bowman—gathered in William Koger's yard to drink and socialize. Koger, Gadson, Joseph Fogle, and Bowman's cousin Hiram Johnson testified that Bowman placed his gun in a burn barrel for safekeeping while he ran an errand. When he returned, the gun was gone, and Bowman accused Gadson of stealing it. Johnson and Gadson testified that, before the altercation escalated, Johnson admitted that he had removed the gun, and Bowman reclaimed it. Johnson observed Bowman place the gun back in his pants as he left Koger's. Bowman's cousin Katrina West testified that Bowman had a gun with him later that afternoon.

### 2. Bowman's Comments About Martin Before the Murder

Several witnesses recounted comments Bowman made about Martin on the day she was murdered. Fogle testified that he gave Bowman a ride from Koger's house. Around that time, Bowman told Fogle that Martin owed him money.

4

That afternoon, Bowman rode to a pharmacy with his sister Yolanda and West. On their way to the pharmacy, Bowman saw Martin parked in front of a house talking to a group of individuals, including Edward Waters. Bowman had Yolanda stop the car so he could speak with Martin. Yolanda testified that Bowman said Martin owed him money and "I want my money today." J.A. 104. Yolanda and West testified that Bowman attempted to get Martin's attention, but Martin "held up her finger saying wait a minute." J.A. 98. According to Yolanda, Bowman responded, "Fuck it. . . . That bitch be dead by dark." J.A. 99. West testified that Bowman said, "Fuck that ride. That bitch will be dead dark fall." J.A. 121. Waters testified that Bowman said, "Fuck waiting a minute" and "I'm about to kill this bitch." J.A. 81.

### 3. Gadson's Eyewitness Account of the Murder

Gadson gave an eyewitness account of the murder. He testified that, around 7:00 or 7:30 p.m., Martin drove up to Koger's house with Bowman. Bowman told Gadson, who had been drinking most of the afternoon, to get in the car. Bowman then directed Martin to make various turns until the trio reached a remote location on Nursery Road. When they arrived, Gadson and Bowman exited the car. As they walked away from the vehicle, Bowman told Gadson that he was going to kill Martin because she was wearing a wire.

Gadson testified that Martin got out of the car, walked down the road, grabbed Bowman by the arm, and told him she was scared. Around that time, a car drove by, and

5

the three hid in the woods.[1]   When they emerged, Martin walked toward her car and Bowman followed behind her.  Gadson then heard three gunshots and saw three muzzle flashes.  Martin ran toward Gadson and turned to face Bowman.  Gadson testified that Martin said, "'Please, . . . don't shoot me no more, I have a child to take care of.'"  J.A. 366.  Bowman shot Martin twice more, and she fell to the ground.  Gadson "messed in [his] pants" and jumped in the car.  J.A. 368.  Bowman, meanwhile, dragged Martin's body into the woods by her feet.  A vaginal swab of Martin's body indicated the presence of male DNA consistent with Bowman's.

When Bowman returned to the car, he told Gadson "I shot that B in the head, heard her head hit the ground."  J.A. 368.  Bowman then drove Martin's car back into town. Gadson testified that Bowman threatened to "blow [his] brains out" if he told anyone what he had seen.  J.A. 370.

4.   Bowman's Confessions and Conduct After the Murder

Several witnesses gave an account of Bowman's actions immediately following the murder.  Gadson testified that he returned to Koger's house and saw Bowman and Johnson driving Yolanda's car.  Johnson corroborated this account, testifying that Bowman asked him to "go downtown."  J.A. 416.  James J. Gadson (James)—Gadson's father and Bowman's uncle—testified that Bowman and Johnson drove up to him.  Bowman gave

---

[1] A driver testified that he observed a car that looked like Martin's parked on the side of the road shortly before 8:00 p.m. on the night of the murder.

James ten dollars and asked him to purchase four pairs of gloves. James and Johnson both testified that James did so and gave the gloves to Bowman.

Around midnight, Bowman, Gadson, Johnson, and Darian Williams drove to a club outside of town in Martin's car. Johnson testified that, when they first entered the car, Bowman told Johnson that he had stolen the vehicle. Bowman drove and distributed the gloves for the passengers to wear while in the vehicle. Gadson testified that he and Williams went into the club while Bowman and Johnson remained outside.[2] Several individuals, including Travis Felder, Keith Rivers, and Valorna Smith, verified that they observed Bowman at the club. Johnson testified that Bowman walked around the parking lot trying to sell Martin's car. Smith testified that, when she exited the club, she saw that Bowman had a pistol in his pocket.

A few hours later, having not succeeded in selling Martin's car, Bowman drove Gadson, Johnson, and Williams back to town. Johnson testified that, during their drive, Bowman said, "I killed Kandee, heh, heh, heh." J.A. 423.[3] He observed that Bowman had a gun in his lap.

---

[2] Gadson admitted that he had been drinking and was "[n]ear about" drunk when he left the club. J.A. 376. He also testified that, when he was first approached by police, he told them that he knew nothing about Martin's murder. During cross-examination, the defense asked Gadson, who had also been charged for the murder, about his plea agreement with the prosecution. The defense also brought to light that Gadson owned the same type of gun as Bowman.

[3] During Johnson's cross-examination, Bowman's counsel asked questions regarding a brain injury that Johnson had suffered. Johnson admitted that he sometimes had problems with his recall or memory.

The State also presented eyewitness testimony that, after his unsuccessful attempt to sell Martin's vehicle, Bowman disposed of it and Martin's body. Felder testified that after returning from the club he was with Smith and Carolyn Brown at Smith's apartment. Brown and Felder testified that Bowman arrived sometime after 3:00 a.m. Felder testified that Bowman asked for help parking a car. Felder followed Bowman, who drove Martin's car to Nursery Road—the same location where, according to Gadson, Bowman had killed Martin and hidden her body. When the two arrived, Bowman entered the woods and returned a few minutes later, dragging Martin's body facedown by her feet. Felder watched Bowman tuck a Hi-Point .380 into his waist before placing Martin's body into the trunk of her car. Bowman turned to Felder and said, "You didn't think I'd do it." J.A. 453. Felder asked, "Did what?" J.A. 453. Bowman replied, "I killed Kandee Martin." J.A. 453.

Felder testified that Bowman then drove Martin's car into a field, parked it, and lit it on fire. Bowman climbed into Felder's car, and Felder told him, "I don't want nothing to do with this." J.A. 455. Felder testified that Bowman responded, "I ain't get you involved with it, don't worry about it, everything is taken care of." J.A. 455–456. Felder dropped Bowman off at home. Felder recalled the events taking between 30 and 40 minutes, but Smith and Brown testified that Felder was gone for 10 to 20 minutes.[4]

---

[4] On cross-examination, the defense questioned Felder's failure to speak with the police, and Felder admitted that he had entered a plea agreement with the State.

8

### 5. Bowman's Arrest

Later in the day on February 17 after the burning car was discovered, officers went to Bowman's house to arrest him. According to one officer, they found Bowman hiding behind a bed in his underwear. The officers retrieved pants for Bowman before leaving the house and, upon searching the pants, they discovered a woman's wristwatch in the pocket. At trial, Martin's mother identified the watch as belonging to her daughter. Bowman's wife, Dorothy, testified he had been wearing the same pants when he came home earlier that morning. The pants also matched descriptions of Bowman's clothing from the day before as recounted by Johnson, Felder, and West.

Officers searched Bowman's living room at the time of his arrest but did not find anything. Almost two months later, they discovered a box of Winchester .380 caliber handgun ammunition hidden in the sofa that had been in Bowman's house at the time of his arrest.

### 6. Family's Attempt to Dispose of the Gun

The State introduced evidence that Bowman's family attempted to dispose of the murder weapon after Bowman's arrest. Dorothy testified that, sometime in the two days following the arrest, Johnson told her that a gun was hidden in the chair in their living room, which deputies had searched at the time of Bowman's arrest. Bowman's sister Kendra testified that Dorothy brought the gun to her house shortly after Bowman's arrest. Kendra and Dorothy took the gun to Bowman's father, who placed it in the center console of his truck.

Kendra and Yolanda testified that, a few days later, they followed Bowman's father to a nearby church, where he retrieved the gun and placed it in the trunk of Kendra's car. Kendra and Yolanda then drove to a bridge, and Yolanda dropped the gun into the Edisto River. Ultimately, Kendra and Yolanda told officers what they had done, and a diver discovered the pistol in the river near where Yolanda dropped it.

### 7.  Forensic Analysis of the Gun and Shell Casings

The State presented evidence derived from forensic analysis conducted on the gun found in the river and on six shell casings and a fired bullet discovered at the murder scene. This testing indicated that all the casings were Winchester-made and that five of the casings had been fired by the gun discovered in the river. As for the sixth casing and the fired bullet, the markings were inadequate to prove or disprove that the specific gun had discharged them, but markings on the fired bullet indicated that it was at least fired by a gun with similar rifling to the one discovered in the river.

### 8.  Defense Case

After the prosecution rested, the defense presented no evidence. During closing argument, the defense emphasized that the State had entered into plea agreements with many witnesses—including Gadson, Felder, Yolanda, and Kendra—to secure their testimony. The defense highlighted Gadson's motivation to testify that Bowman was the shooter, along with potential discrepancies between Gadson's account of the murder and other evidence, such as the number of casings found at the scene compared to the number of shots Gadson recounted and the location of the bullets' entry on Martin's body. The defense also suggested that the murder weapon, which Dorothy found in the couch after a

10

tip from Johnson, may have been planted there after the officers searched the area because one door to Bowman's house could not be locked.

After approximately three hours of deliberations, the jury found Bowman guilty of murder and third-degree arson.

### B. Penalty Phase and Direct Appeal

The case moved to the penalty phase. The State identified four aggravating circumstances to support the death penalty: that the murder occurred (1) in the commission of a kidnapping, (2) in the commission of criminal sexual conduct, (3) in the commission of robbery with a deadly weapon, and (4) in the commission of larceny with a deadly weapon. The State supplemented its guilt-phase evidence with evidence that Bowman had four prior convictions for larceny or burglary, including court records and victim testimony. The State also presented photographs of Martin's corpse and testimony from Martin's parents about the effect of her death on their lives and the life of her young son.

The defense then presented mitigation evidence, including testimony about the conditions of Bowman's upbringing and the effect of those events on his decisionmaking, the ways Bowman assisted his family growing up, and Bowman's good prison behavior and ability to adjust to prison life. The defense also called Frankie Martin (Frankie) to the stand. He testified that, around 12:00 or 1:00 p.m. on the day of the murder, Martin, Bowman, and Fogle were at his home for "[a] couple of minutes," during which time Bowman and Martin went "in the bathroom, talked for a minute, then they left." J.A. 1185–1186.

11

The defense also recalled Felder and played a video that depicted him purchasing gasoline at 3:14 a.m. on February 17, 2001. Felder conceded that he did not mention the purchase during his guilt-phase testimony. He testified that Bowman had given him a plastic jug to put the gasoline in and asked Felder to purchase two or three dollars' worth of gas. Felder purchased the gas and brought it to Nursery Road, where Bowman retrieved the gas from Felder's vehicle before setting Martin's car ablaze.

Following closing arguments and less than two hours of deliberation, the jury found two aggravating circumstances: that Bowman murdered Martin (1) in the commission of a kidnapping and (2) in the commission of larceny with a deadly weapon. The jury recommend the death penalty, which the judge imposed.

Bowman appealed to the Supreme Court of South Carolina, raising five issues. That court affirmed. *See State v. Bowman*, 623 S.E.2d 378, 380 (S.C. 2005). The United States Supreme Court denied Bowman's petition for a writ of certiorari. *See Bowman v. South Carolina*, 547 U.S. 1195 (2006).

### C. State PCR Court Proceedings

After his direct appeal, Bowman applied for post-conviction relief in the South Carolina Court of Common Pleas. His initial application was based on claims of ineffective assistance of counsel that are not at issue here. During the PCR proceedings, three pieces of evidence came to light that serve as the bases for Bowman's *Brady* claims before us: (1) a memorandum written by Samuel Richardson, a prosecution investigator who interviewed a jailhouse informant who claimed that Gadson had confessed to the murder (Richardson Memo); (2) a mental health report that was prepared to determine if Gadson

12

was competent to stand trial (Gadson Report); and (3) unindicted charges pending against Johnson in an unrelated case at the time of Bowman's trial.

### 1. Richardson Memo

Rickie Davis, an inmate who was housed at separate times with both Bowman and Gadson, handwrote a note dated August 6, 2001, that states: "I Rickie Davis was on A side with Gadson and he said that he was the one that shot the Girl and gave Bowman back the gun that was used and He said that it didn't mat[t]er because [Bowman's family] had got caught with the gun He also that the police all he got to do is say [Bowman] did it." J.A. 2812. The State provided this note to defense counsel before Bowman's trial.

The State sent Richardson to investigate. Richardson wrote a memorandum summarizing his conversation with Davis:

> Ricky Davis states that he and James Taiwan Gadson along with 4 or 5 others were sitting at a table on the A-side. Gadson was talking to the group when he said something about killing a girl. He stated that they were going to rob someone. They thought she was wired and he shot her in the head with a .380.
>
> The conversation occurred about three weeks before he wrote the letter. (August 6, 2001).
>
> Afterwards, Davis was playing chess with Marion Bowman in Cell 8. Davis told Marion Bowman about the conversation he had with James Gadson. Bowman said "if you heard all this, write it down." Bowman showed him a picture of the dead girl. He also showed him a file from his attorney.
>
> Bowman said he had been smoking dope that day. He said it was him, James Gadson and the girl at the scene. The girl was suppose[d] to help them rob a house to get drugs and money. Bowman knew the intended victim.
>
> Bowman never admitted he shot anyone.

13

> Subsequent to this, Davis talked to James Gadson again. At this time, Gadson said that Bowman shot her.

J.A. 2873 (capitalization omitted). The Richardson Memo was not provided to the defense.

The parties developed evidence about this nondisclosure during the PCR hearings. Davis testified that he did not recall Gadson actually discussing the case with him or saying anything contained in his handwritten note. Rather, Davis claimed that Bowman had told him to write the note. Davis also testified that when his attorney, who coincidentally was also one of Bowman's trial counsel, approached Davis about the note in 2002, Davis told her that Bowman had asked him to write it. The attorney, Marva Hardee-Thomas, testified that she did not remember meeting with Davis or seeing the note.

Bowman's lead trial counsel, Norbert Cummings, testified that he had seen the note and had sent an investigator to question Davis about it before trial. Cummings recalled that the investigator reported back that Davis "recant[ed]," "never said what he allegedly said," and "ain't going to cooperate." J.A. 2519. Cummings relied on his investigator's synopsis. Consequently, Cummings made the "strategic decision [that] it was not worth it to call . . . Davis," affirming that if "Davis had gotten up on the stand and said, 'Marion Bowman told me to write that letter and I don't know anything about it,'" Davis's testimony would have created the appearance that Bowman fabricated evidence, prompting an inference of guilt. J.A. 2520.

Cummings did, however, testify that, had he known there was a "consistent statement to [Davis's handwritten note]," he would have "followed back up" with Davis. J.A. 2135–2136. The Richardson Memo would have "shed a different light" and could

14

have led to additional investigation. J.A. 2521. Cummings "wish[ed]" that he "would have had" the Richardson Memo. J.A. 2301. Still, Cummings conceded that, even if he had both documents, he "would [have been] in the same boat" if Davis continued to recant, J.A. 2527, reiterating that he would not have wanted "Ricky Davis . . . to come into court and testify that Marion Bowman told him to write that and made it all up," J.A. 2634.

The PCR court determined that the Richardson Memo could not sustain a *Brady* claim. First, it held that there was no "suppression of favorable evidence" because the Memo could have been used—at most—to impeach Davis if he had testified at trial and the State had already provided the defense with Davis's handwritten note, which contained the crucial fact that Gadson allegedly admitted to murdering Martin. J.A. 3319. The court noted that defense counsel never stated he would have called Davis to testify, given his investigator's conclusion that Davis was "full of bunk." J.A. 3320 n.6 (internal quotation marks omitted). As Cummings testified, the defense would have been "in the same boat" even if it had the Richardson Memo. J.A. 3320 (internal quotation marks omitted).

Additionally, the PCR court concluded that the Richardson Memo was not material. Davis previously told the defense's investigator and then also testified at the PCR hearing that his handwritten statement was not true, that he knew nothing about the case, and that he had written the note at Bowman's behest. The PCR court found that "the difference between possible impeachment with the disclosed handwritten statement in Davis's own hand, and impeachment with the [Richardson] Memo or testimony from [Richardson], [was] not so great that it undermine[d] confidence in the verdict under the standard for materiality." J.A. 3321.

15

The PCR court added that the Richardson Memo "especially" lacked materiality "given the overwhelming evidence of [Bowman's] guilt." J.A. 3321. The court summarized that evidence as follows: Several witnesses—including one of Bowman's sisters—testified that Bowman threatened to kill Martin on the day of the murder. Gadson testified that he saw Bowman shoot Martin, shoot her again as she begged for her life, and drag her body into the woods. Witnesses testified that Bowman drove Martin's car after the murder and required the passengers to wear gloves. Johnson testified that he heard Bowman admit he killed Martin. Felder testified that he saw Bowman drag Martin's body out of the woods, put it in the trunk of her car, and set the car on fire. He also testified that he heard Bowman admit he killed Martin. Martin's watch was in Bowman's pants pocket when he was arrested, and his DNA was found inside her body. Bowman's family testified that they found the gun—which was later matched to five bullet casings at the murder scene—and threw it in the river. In view of this evidence, the PCR court concluded, the additional impeachment value of the Richardson Memo was not material.

## 2.  Gadson Report

Initially, Gadson was charged alongside Bowman for Martin's murder. To determine if he was competent to stand trial, the Dorchester County Court ordered a mental health evaluation, resulting in the Gadson Report. The Report diagnosed Gadson with a "History of Seizure Disorder" and "Cannabis Dependence" but concluded that he was competent to stand trial. J.A. 2805.

Regarding Gadson's diagnoses, the Report recounted three "seizure[]-like episodes" Gadson had suffered, during which he "blacked out." J.A. 2807 (internal quotation marks

16

omitted). The last episode occurred around December of 2000 and led to a hospital visit where Gadson was told that he had likely experienced a "light seizure." J.A. 2807 (internal quotation marks omitted). Despite the seizures, "MRI scan, EEG, and neurological evaluations were normal and did not demonstrate evidence of central nervous system pathology." J.A. 2807. The Report also stated that Gadson reported smoking large quantities of cannabis—up to six blunts a day. Indeed, two of his seizures coincided with marijuana use.

In addition to these diagnoses, the Report detailed the results of mental status and psychological exams. The examiners "found no evidence of long or short-term memory impairment" and concluded that Gadson displayed a good "ability to concentrate" and "the capacity for abstract reasoning." J.A. 2808. The Report noted that Gadson reported hearing "a voice and a little beeping noise" but concluded that his "description of this hallucination is atypical for mental illness." J.A. 2808 (internal quotation marks omitted). During a psychological test, Gadson "exhibited some mild impairment of verbal memory, but [his] verbal learning was good." J.A. 2808. According to the Report, "[o]ther areas of cognition that were assessed were adequate." J.A. 2808.

The Gadson Report was not provided to the defense. During the PCR hearings, Gadson acknowledged that he had undergone the relevant evaluation but denied ever saying that he heard a voice or beeping noise. Bowman's counsel testified that, had he received the Report, he would "hope and pray" that he would have asked Gadson about "hearing voices" and "blacking out." J.A. 2276. The Solicitor in charge of Bowman's

17

prosecution testified that the Report "arguably" would have had "some impeachment value." J.A. 2738.

The PCR court concluded that the Gadson Report was not suppressed, not favorable, and not material. As to suppression, the PCR court determined that defense counsel could have obtained the Report by other means. Gadson had been Bowman's co-defendant, and his mental health report was required by a court order, which was a public record. Had counsel reviewed the clerk of court records for Gadson, the PCR court reasoned, he would have realized a psychiatric report was available and could have requested a copy of the Report by subpoena.

Regarding favorability, the PCR court determined the Report "would have had no impeachment value" because it contained "no indication that Gadson suffered from any type of memory impairment that would have affected his ability to recall what occurred in this case." J.A. 3279. Further, the court explained, the Report did "not indicate that Gadson suffered from any mental illness other than cannabis dependence." J.A. 3279.

The PCR court also deemed the Report not material because it did not indicate Gadson suffered any memory loss from his seizures, there was no evidence he experienced a seizure or smoked marijuana on the day of the murder, and Gadson admitted at trial "that he drank alcohol all day on the day of the murder." J.A. 3279. Weighing the Report's additional impeachment value against the "overwhelming evidence of guilt" described above, J.A. 3279, the PCR court concluded that nondisclosure of the Report did not undermine confidence in the outcome of Bowman's trial.

18

3.  Johnson's Charges

During the PCR hearings, it came to light that Johnson had charges pending against him at the time of Bowman's trial.  The relevant documents indicated that a warrant for Johnson's arrest issued on May 29, 2001, for a burglary and larceny committed on September 26, 2000, and for receipt of stolen goods on November 2, 2000.  Johnson was not indicted on these charges, however, until April 2003—almost a year after Bowman's trial.  The charges were dismissed in April 2003 and December 2004.

The Solicitor in charge of Bowman's prosecution testified that there was no agreement concerning the charges, and Johnson testified that the dismissal of his charges had nothing to do with his testimony in Bowman's case.  Defense counsel testified that he would have questioned Johnson about any pending charges if he had been aware of them.

The PCR court held that Bowman failed to establish materiality for the undisclosed charges.  The charges were of limited impeachment value, the court reasoned, because there was no evidence that Johnson received any benefit for his testimony, the charges were unrelated to the murder, and the defense had already impeached Johnson at trial based on a head injury he sustained when he was shot by a police officer.  The PCR court thus concluded that the charges were not material.

*   *   *

Given its conclusions that neither these nor any other claims were meritorious, the PCR court denied Bowman's application for relief.  Bowman appealed, and the South Carolina Supreme Court denied his petition for certiorari as to the *Brady* claims at issue

19

here, granted certiorari on an unrelated ground, and affirmed. *See generally Bowman v. State*, 809 S.E.2d 232 (S.C. 2018).

### D. Federal Habeas Proceedings

Bowman then sought a writ of habeas corpus in federal court, *see* 28 U.S.C. § 2254, raising seven grounds for relief in his petition, including the *Brady* claims discussed above. Pursuant to local rule, the case was referred to a magistrate, who recommended denying the petition. The district court agreed.

### 1. Richardson Memo

Regarding the Richardson Memo, the district court "found no basis to conclude that the PCR court was incorrect" in determining that nondisclosure was not material. *Bowman v. Stirling*, No. 9:18-cv-00287, 2020 WL 1466005, at *18 (D.S.C. Mar. 26, 2020). Although the district court acknowledged "the arguable impeachment value of the undisclosed information," it also held that the PCR court was not unreasonable in determining that favorable evidence was not suppressed because defense counsel already possessed Davis's handwritten note. *Id.*

### 2. Gadson Report

Addressing the Gadson Report, the district court determined that "the PCR court did not unreasonably apply federal law in concluding that there was no *Brady* violation because Bowman could have obtained the report by other means." *Id.* (discussing *Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002), and *Banks v. Dretke*, 540 U.S. 668 (2004)). The district court did not discuss materiality because Bowman did not object to the magistrate judge's

20

conclusion that the PCR court was not unreasonable in finding the information in the Gadson Report not material.

### 3.  Johnson's Charges

As for Johnson's pending charges, the district court observed that the PCR court considered the "extensive and varied evidence of guilt, which came from multiple witnesses," and the limited value of this information for impeachment. *Id.*  The district court concluded that "the PCR court's determination that this information was not material was based on reasonable factual findings." *Id.*

\* \* \*

The district court denied Bowman's habeas petition and his subsequent motion to alter or amend the judgment.  Bowman then appealed to this Court.  We granted a certificate of appealability on the *Brady* claims but denied it for the other claims Bowman sought to appeal.  *See* 28 U.S.C § 2253(c)(1)(A) (prohibiting appeal absent a certificate of appealability).

### II.

We review de novo the district court's order denying Bowman habeas relief. *Richardson v. Branker*, 668 F.3d 128, 138 (4th Cir. 2012).  "In doing so, however, we are guided and restricted by the statutory language of 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA], and a wealth of Supreme Court precedent interpreting and applying this statute." *Horner v. Nines*, 995 F.3d 185, 197 (4th Cir. 2021) (internal quotation marks omitted).  Under this statutory standard, federal courts "shall not" grant a writ of habeas corpus "with respect to any claim that was

21

adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A *Brady* violation requires the defendant to prove three elements: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) that evidence must be "'material either to guilt or to punishment.'" *Strickler v. Greene*, 527 U.S. 263, 280–282 (1999) (quoting *Brady*, 373 U.S. at 87); *see also United States v. King*, 628 F.3d 693, 701–702 (4th Cir. 2011) (defendant bears the burden of establishing a *Brady* violation). "'[E]vidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–470 (2009)).

When multiple pieces of evidence have been suppressed, materiality turns on "the cumulative effect of all such evidence." *Kyles v. Whitley*, 514 U.S. 419, 421 (1995). That effect must be evaluated "in the context of the entire record." *Turner*, 137 S. Ct. at 1893 (internal quotation marks omitted). In sum, the materiality question "is whether 'the favorable evidence,' 'considered collectively,' 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v.*

22

*Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021) (emphasis removed) (quoting *Kyles*, 514 U.S. at 435–436).

Bowman argues that we must consider the cumulative materiality of the alleged *Brady* evidence de novo. The PCR court ruled that each of Bowman's three items of evidence was, by itself, not material. But the PCR court did not rule on cumulative materiality, likely because prejudice was dispositive only for the Johnson charges (as the court also held that the Richardson Memo and Gadson Report were not favorable or suppressed). Still, the court did evaluate the materiality of each of the three withheld pieces of evidence.

We have no discretion to disregard the standards Congress has imposed for review of federal habeas petitions filed by state prisoners. But this deferential standard applies only to claims "adjudicated on the merits in State court." 28 U.S.C. § 2254(d); *see Johnson v. Williams*, 568 U.S. 289, 302 (2013). If the state court did not resolve the merits of a properly presented federal claim, then there is no decision to which we can defer and we review the question de novo. *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015); *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003). The same is true when the state court did not decide one element of a properly presented federal claim; if the federal court must consider that element, it does so de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (assessing de novo the deficient performance element of petitioner's ineffective assistance of counsel claim because the state court did not decide it but ruled solely on the prejudice element); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (assessing de novo the prejudice element of petitioner's ineffective assistance of counsel claim because the state

23

court did not decide it but ruled solely on the deficient performance element); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (same).

In an analogous case, we reviewed a state prisoner's claim of cumulative materiality de novo when the state court addressed the materiality of some items of evidence but did not have the opportunity to consider other evidence revealed for the first time during the federal habeas proceedings. *See Monroe v. Angelone*, 323 F.3d 286, 297–299 (4th Cir. 2003). As we explained, in that circumstance we had "no way of deferring to an earlier state court adjudication on materiality because no state court considered all of the *Brady* material" presented in federal court. *Id.* at 299. We therefore made "an independent assessment of whether the suppression of exculpatory evidence—including the evidence previously presented to the state courts—materially affected" the defendant's conviction. *Id.*

Bowman's case differs somewhat from *Monroe* in that all of the alleged *Brady* evidence here was before the PCR court, and it analyzed the materiality of each item individually but did not assess their collective import. The PCR court's item-by-item prejudice evaluations warrant deference as "adjudicat[ions] on the merits in State court." 28 U.S.C. § 2254(d). At the same time, we recognize that individual items of suppressed evidence that are not material on their own may, in the aggregate, "undermine[] confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678; *see Kyles*, 514 U.S. at 421–422 (evaluating whether "the net effect of the [withheld] evidence" raises "a reasonable probability that its disclosure would have produced a different result").

24

We need not resolve the standard of review, however, because even applying de novo review—the standard most favorable to and requested by Bowman—the cumulative evidence is not material. We will therefore assume, without deciding, that the three pieces of evidence Bowman identified were favorable and suppressed. *See Nicolas v. Att'y Gen. of Md.*, 820 F.3d 124, 130–131 (4th Cir. 2016) (assuming that suppressed statements were favorable but denying habeas petition because they were not material); *see also Olvera v. Gomez*, 2 F.4th 659, 675 (7th Cir. 2021) (assuming deficient attorney performance but denying habeas petition because, on de novo review, the deficiencies were not prejudicial). We will also assume that we may review cumulative materiality de novo in this circumstance. Even granting all of these assumptions in Bowman's favor, his claim for federal habeas relief still fails, as we explain below.[5]

### III.

We turn now to the alleged *Brady* evidence that was withheld during Bowman's trial. We discuss the value of each piece of evidence individually before weighing the prejudicial effect of their alleged suppression cumulatively. *See Kyles*, 514 U.S. at 436 n.10; *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013).

---

[5] If we found in Bowman's favor that the state court's decision regarding the favorability or suppression of this evidence was unreasonable under the standard of Section 2254(d)—a question we do not decide—we would nevertheless affirm because the evidence, considered cumulatively, is not material. We therefore may take the unusual step of assuming the statutory question in Bowman's favor and proceed directly to the dispositive inquiry. *See* 28 U.S.C. § 2254(d) (requiring that the writ "shall not be *granted*" unless the state court adjudication of the claim was unreasonable in one of the ways specified in the statute (emphasis added)).

A.

We begin with the Richardson Memo. That document recorded the same critical information as Davis's handwritten note, which was provided to the defense: that Gadson allegedly confessed to Davis that he, not Bowman, killed Martin. The Memo also included additional details about Gadson's alleged confession and what Bowman said to Davis in response. Bowman argues that he could have used the Richardson Memo to question Richardson, Davis, or Gadson at trial and the Memo would have boosted his effort to paint Gadson as an alternative suspect.

As an initial matter, the Richardson Memo, which was an out-of-court statement recounting Davis's out-of-court statements about Gadson's out-of-court statements, constituted multiple layers of hearsay. *See* S.C. R. Evid. 801(c), 802; *see Walker v. Kelly*, 589 F.3d 127, 142–143 (4th Cir. 2009) (considering the path to admission at trial and the implications thereof when weighing materiality). Because of this, to question Richardson about the substance of his Memo, defense counsel likely would have had to present Davis as a witness, and Davis would have had to deny telling Richardson the information recorded in the Memo. *See* S.C. R. Evid. 801(d)(1) (identifying a prior inconsistent statement by a witness as "not hearsay").

But as defense counsel knew before trial—and the PCR hearings reinforced—Davis's testimony would have harmed, not helped, Bowman's case. During the PCR hearings, Davis testified that he never talked with Gadson about the murder. Rather, all his information about the case came from Bowman, and he wrote his note at Bowman's insistence, using information Bowman supplied. As Bowman's counsel testified at the

26

PCR hearing, this testimony would have been incredibly damaging to Bowman's case by implicating him in falsifying evidence to shift the blame. Certainly, if Davis testified and recanted the contents of his handwritten note, defense counsel could have used the Richardson Memo to cross-examine him, demonstrating that Davis had previously made a detailed statement consistent with the note to a law enforcement officer. But even with the Memo, defense counsel would not have wanted "Davis . . . to come into court and testify that Marion Bowman told him to write that and made it all up." J.A. 2634.

When it comes to impeaching Gadson, the Memo also was cumulative of Davis's handwritten note, which the defense already possessed. *See Turner*, 137 S. Ct. at 1894–1895 (reasoning that certain "undisclosed impeachment evidence" was not material because "it was largely cumulative of impeachment evidence [the defendants] already had"); *see also Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) ("Suppressed evidence that would be cumulative of other evidence . . . is generally not considered material for *Brady* purposes."). Both documents contain the central inconsistent statement—that Gadson had previously identified himself, not Bowman, as the murderer. The Memo's additional details about the crime were not inconsistent with Gadson's testimony, and his testimony was corroborated by other evidence at trial. Thus, for impeaching Gadson, the Memo offered little, if anything, beyond what the defense had already received.

## B.

We turn next to the Gadson Report. Bowman argues that the Report would have been valuable to impeach Gadson's memory as the sole eyewitness to testify about the

27

murder.[6] Although the Report would not have bolstered Bowman's theory of Gadson as an alternative suspect, it would have provided some basis for additional impeachment questions on cross-examination. The Report was a double-edged sword, however, and its value for additional impeachment of Gadson's recall was minimal.

The Report states that Gadson suffered three seizure-like episodes in the years before the murder, with the last occurring around December of 2000, approximately two months before the murder. Two of those episodes coincided with marijuana use, and the Report diagnosed Gadson as cannabis dependent. The Report also noted that Gadson reported hearing "a voice and a little beeping noise" and that, during a psychological test, he exhibited "some mild impairment" in his ability to remember what he read or heard. J.A. 2808 (internal quotation marks omitted). Taken together, this evidence could have been used to question Gadson's memory and sanity before the jury.

But the Gadson Report's additional impeachment value would be slight. There is no evidence in the record that Gadson suffered a seizure the night of the murder; indeed, the Report states that his last episode was months before. Similarly, no evidence suggested that Gadson smoked marijuana on the day of the murder. Moreover, Gadson's memory of

---

[6] Bowman did not object to the magistrate judge's conclusion that the Gadson Report was not material and so has likely waived the right to appellate review of this issue. *See United States v. Midgette*, 478 F.3d 616, 621 (4th Cir. 2007). The State has not urged us to find the issue waived. We will assume—without deciding—that the State may waive the waiver, *see Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 n.1 (7th Cir. 2012); *United States v. Quiroz*, 22 F.3d 489, 491 (2d Cir. 1994), or that the "interests of justice" warrant discretionary review of the waived issue, *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 104–105 (4th Cir. 2020) (internal quotation marks omitted), because, even considering the Report, we ultimately must affirm.

28

the events had already been impeached through testimony that he had been drinking alcohol all afternoon before the murder and was "[n]ear about" drunk by the time he left the club with Bowman and the others later that night.  J.A. 376.

Further, parts of the Report bolstered Gadson's memory and sanity.  For example, the examiners found that Gadson "was able to recall significant past personal information," showed "no evidence of long or short-term memory impairment," had good concentration and "the capacity for abstract reasoning," and was of average intelligence.  J.A. 2808.  After noting Gadson's mild verbal memory impairment, the Report states that his "verbal learning was good" and "[o]ther areas of cognition that were assessed were adequate."  J.A. 2808.  Additionally, the Report indicates that Gadson's account of hearing a voice and a beeping noise was "atypical for mental illness."  J.A. 2808.  The Report's ultimate conclusion that Gadson was competent to stand trial would also undermine any defense effort to suggest that he was mentally unstable.  If the defense had chosen to use the Gadson Report at trial, the State could have been expected to characterize the Report as a professional assessment that Gadson was sane and his memory reliable.

C.

Third, we consider Johnson's unindicted charges.  Bowman contends that, had those charges been disclosed, defense counsel could have questioned Johnson about them during trial to suggest to the jury that Johnson was testifying against Bowman in hopes of receiving favorable treatment from the prosecution with respect to those unrelated charges.  *See* S.C. R. Evid. 608(c) ("Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise

29

adduced."). Bowman emphasizes that, during closing argument for the guilt phase of trial, the State highlighted the absence of any deal with or charges against Johnson, telling the jury that he did not have "any reason to say something [that] wasn't true." J.A. 829. The State counters that Johnson had already been impeached about memory problems resulting from being shot in the head by a police officer, which suggested his involvement in criminal activity.

Although the defense did elicit testimony about Johnson's head injury, evidence of unresolved charges pending against him in the same prosecutor's office would have had independent impeachment value. Even without any evidence of an agreement between Johnson and the State regarding those charges, a jury could infer that Johnson was motivated to curry favor with the prosecution so that the charges against him would be dropped or otherwise beneficially resolved. Had the charges been disclosed, the prosecutor could not have claimed in closing argument that there was no evidence of *any* charges against Johnson, but only charges related to this crime.

At the same time, there are reasons to think this information would have been of limited effect. Other evidence at trial corroborated Johnson's account of events. And the jury heard that multiple witnesses were testifying pursuant to plea agreements with the State for charges stemming from this murder, including Gadson, Felder, Yolanda, and Kendra. Although Johnson's testimony was helpful to the prosecution—especially his memory that Bowman snickered as he confessed to the killing—he was by no stretch the centerpiece of the State's case. Johnson's ancillary role distinguishes this case from those on which Bowman relies. *See Giglio v. United States*, 405 U.S. 150 (1972); *Boone v.*

30

*Paderick*, 541 F.2d 447 (4th Cir. 1976); *Ruetter v. Solem*, 888 F.2d 578 (8th Cir. 1989). In those cases, the government suppressed evidence of agreements not to prosecute witnesses on whom the government's case "almost entirely" depended, *Giglio*, 405 U.S. at 154; *see Boone*, 541 F.2d at 452, 453 (witness was "by far the most important" and "critical to the conviction"), and evidence that the government delayed a sentence commutation hearing for its "principal witness" until after the defendant's trial, *Ruetter*, 888 F.2d at 580; *see also id.* at 581 (prosecution's case "depended almost entirely" on the witness's testimony). Here, there is no evidence that the State had treated Johnson favorably at the time of trial or offered to do so, nor was Johnson the State's central witness against Bowman. The undisclosed evidence of Johnson's pending charges was undoubtedly valuable for impeachment, but its importance does not rise anywhere close to the level of the suppressed evidence in *Giglio*, *Boone*, or *Ruetter*.

## D.

We now assess the cumulative materiality of the three pieces of undisclosed evidence to determine whether the State violated Bowman's due process rights. *See Kyles*, 514 U.S. at 436–437; *Bartko*, 728 F.3d at 340. We must evaluate the withheld evidence "in the context of the entire record" at trial and determine "whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner*, 137 S. Ct. at 1893 (internal quotation marks omitted). Having done so, we conclude that there is no such reasonable probability.

The evidence of Bowman's guilt was truly "overwhelming," as the PCR court put it. J.A. 3279, 3321. And that evidence did not depend solely on Gadson and Johnson—

31

far from it.   At least four witnesses testified that they saw Bowman carrying a gun consistent with the murder weapon on the day Martin was killed, and others testified to seeing Bowman with a pistol of some type both before and after the murder.   Three different witnesses, including Bowman's own sister, testified that Bowman said Martin would "be dead by dark" or that he was "about to kill [Martin]."   J.A. 81, 99, 121.   Two witnesses testified that, on the day of the murder, Bowman complained that Martin owed him money.   Two other witnesses, Felder and Johnson, testified that Bowman told them point-blank that he killed Martin.   Felder—whose testimony is not affected by any alleged *Brady* evidence—further testified that, less than twelve hours after the murder, Bowman led Felder directly to where Martin's body was hidden, retrieved her body from the woods within "a minute, two minutes," put it in the trunk of her car, and then set both corpse and car ablaze.   J.A. 451.   Other witnesses corroborated Felder's account that he assisted Bowman with a car that night.

Several witnesses confirmed that Bowman was driving Martin's car the night of the murder.   James testified that, at Bowman's request, he purchased four pairs of gloves for Bowman.   Consistent with James's testimony, Johnson and Gadson testified that Bowman required them to wear gloves while riding in Martin's car.   Johnson testified that he observed Bowman attempting to sell Martin's car at the nightclub, and other witnesses corroborated that Bowman and Johnson were at the club that night.   Although the defense could have questioned Johnson's credibility based on the undisclosed evidence about his pending charges, his testimony was in large part corroborated by and consistent with that of other witnesses.

32

Then there is the circumstantial and forensic evidence. A vaginal swab of Martin's body indicated the presence of male DNA consistent with Bowman's. Officers found Bowman hiding in his home the day after the murder. Martin's wristwatch was in the pocket of the jeans that, according to Bowman's wife, Bowman had been wearing the night before—jeans that were consistent with those Johnson, West, and Felder described Bowman as wearing the day of the murder. Following Bowman's arrest, Bowman's wife found a pistol hidden in their living room. Bowman's sisters testified that they worked with Bowman's father to dispose of the gun in the Edisto River. In Bowman's couch, officers discovered a box of corresponding bullets that also matched those found at the murder scene. Forensic analysis of the casings found at the scene confirmed that five of the six were fired from the gun retrieved from the Edisto River and indicated that the sixth casing and a fired bullet found at the scene could have been fired by that gun.

All of this is without even considering Gadson's eyewitness account of the murder. Yet, even if the Gadson Report and the Richardson Memo had been admitted into evidence and reduced Gadson's credibility, much of his eyewitness account remained consistent with the other evidence presented to the jury. For example, Gadson's testimony about the location of the murder was consistent with Felder's testimony about the place to which Bowman later returned to retrieve Martin's body. Similarly, Gadson stated that Bowman dragged Martin's body into the woods after the murder, and Felder testified that Bowman dragged Martin's body out from the same woods. Gadson's testimony that a car drove by while he, Bowman, and Martin were on Nursery Road and that the three hid in the woods was corroborated by a driver, who testified that he observed a car consistent with Martin's

33

parked off Nursery Road at around the same time the trio would have been there. Even Gadson's testimony that Bowman fired the fatal shots is corroborated by Felder's independent testimony that Bowman confessed to him, "I killed Kandee Martin." J.A. 453.

In sum, the undisclosed evidence, at best, would have undercut Johnson's and Gadson's reliability in the eyes of the jury. But both men's testimony was consistent with the other evidence offered at trial. This was not a thin or circumstantial case, or one that relied on the testimony of one, or even two, crucial witnesses to connect Bowman to the crime. To the contrary, the State offered a veritable mountain of evidence linking Bowman to the murder. Even discounting their testimony based on Johnson's motivation to please the State, Gadson's mental health, and Davis's recanted story about Gadson confessing in prison, the evidence against Bowman remains forceful and compelling. *Cf. Smith*, 565 U.S. at 76 ("[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."); *Strickler*, 527 U.S. at 292–296 (finding evidence impeaching an eyewitness account immaterial because of the strong evidentiary support for the defendant's guilt of capital murder); *United States v. Higgs*, 663 F.3d 726, 740–742 (4th Cir. 2011) (finding that exculpatory evidence was not material because of "overwhelming evidence" of guilt); *United States v. Robinson*, 627 F.3d 941, 952–953 (4th Cir. 2010) (finding evidence impeaching testifying officers not material because numerous other witnesses and physical evidence "amply proved the government's contentions"). Given the limited value of the three pieces of undisclosed evidence and the overwhelming evidence of Bowman's guilt, we find the cumulative effect

34

of the undisclosed evidence insufficient to "undermine confidence" in the jury's verdict. *Kyles*, 514 U.S. at 435; *see Turner*, 137 S. Ct. at 1895.[7]

### IV.

Having granted every permissible assumption in Bowman's favor and having carefully considered all the undisclosed evidence in light of the entire record at trial, we conclude that Bowman has not carried his burden to prove a reasonable probability that, had he received the undisclosed evidence, the jury would not have convicted him of Martin's murder or recommended a sentence of death. We therefore must affirm the district court's denial of Bowman's petition for a writ of habeas corpus.

*AFFIRMED*

---

[7] Before the PCR court, Bowman did not contend that the undisclosed evidence was material to his sentence but only to the guilt phase of trial. In our Court, Bowman suggests that the undisclosed evidence could be material to his sentence because it would have created lingering doubt as to his guilt and relative culpability. Even assuming we may consider this argument, we reject it for the reasons already explained.